T.C. Memo. 1996-81


UNITED STATES TAX COURT


MARTIN H. DROZ, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 25672-93.          Filed February 26, 1996.


Martin H. Droz, pro se.

<u>Glorianne Gooding-Jones</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


CHIECHI, <u>Judge</u>:  Respondent determined a deficiency in
petitioner's Federal income tax for 1991 in the amount of $69,952
and an addition to tax under section 6651(a)(1)[1] and an accuracy-

_____

[1]  All section references are to the Internal Revenue Code (Code) in effect for the year at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

related penalty under section 6662(a) in the amounts of $15,672 and $11,967, respectively.

The issues remaining for decision are:

(1) Is petitioner entitled for 1991 to a charitable contribution deduction under section 170(a) for a flight helmet that he donated to a museum during that year? We hold that he is entitled to a deduction in the amount of $500.

(2) Is petitioner liable for 1991 for self-employment tax? We hold that he is.

(3) Is petitioner liable for 1991 for the accuracy-related penalty under section 6662(a)? We hold that he is.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner had a mailing address in Arcadia, California, at the time the petition was filed.

At all relevant times, petitioner operated a sole proprietorship that engaged in the business of distributing plumbing products.

In June 1977, in response to a newspaper advertisement by an individual in Downey, California, petitioner purchased for $100 a high-altitude, full-pressure flight helmet made in 1959 that was used by the U.S. Navy and that is known, and hereinafter referred to, as a Mark IV helmet.

A Mark IV helmet is not a space helmet and was not at any

time employed in trips into space, although its development was one step in a multiple-step design and development process that ultimately led to production of the Mercury helmet, a space helmet that was used in trips into space. Although certain Mark IV helmets were used in training Mercury astronauts, the serial number on the Mark IV helmet at issue indicates that it was not made at a time when Mercury astronauts were in training and that it was not used for that purpose.

A Mark IV helmet is not an unusual or scarce helmet. To the contrary, it is, and at all relevant times has been, the most common and most available high-altitude, full-pressure flight helmet.

Throughout the years 1977 to 1991, petitioner kept the Mark IV helmet at issue in its case and stored it in a closet in his residence. During that period, petitioner did not insure that helmet against loss, nor did he insure his residence against fire, theft, or other catastrophe.

Around 1990 or 1991, petitioner placed an advertisement in a newspaper offering the Mark IV helmet at issue for sale. That advertisement stated that petitioner was "taking bids" for a "SPACE TEST FLIGHT HELMET--USED IN MERCURY PROGRAM WITH CASE". In response to his advertisement, petitioner received telephone calls from Keith R. Jamieson, M.D. (Dr. Jamieson) and Dennis Gilliam (Mr. Gilliam), both of whom expressed an interest in the

helmet that petitioner described in that advertisement.

Dr. Jamieson, a general surgeon, has been a collector of flight helmets and combat helmets, including Mark IV helmets, for about 25 years. At the time of the trial herein, he had over 1,000 helmets in his collection, 150 of which were flight helmets and seven to 10 of which were Mark IV helmets. Just prior to 1990, Dr. Jamieson purchased a Mark IV helmet, suit, and gloves for a total price of $700. At about the same time, he also purchased two incomplete Mark IV helmets for a total price of $400. During 1990 or 1991, Dr. Jamieson purchased a Mark IV helmet for $350 at a flea market in Long Beach, California. In addition, sometime during 1990 or 1991, he received two Mark IV helmets as gifts from two different individuals.

During his telephone conversation with petitioner that took place around 1990 or 1991, Dr. Jamieson identified himself as a collector of helmets and asked petitioner for a description of the helmet that he was offering for sale. Based on petitioner's description of that helmet, Dr. Jamieson determined that the helmet petitioner was offering for sale was a Mark IV helmet, and not a space helmet as advertised by petitioner in the newspaper.

Petitioner offered to sell Dr. Jamieson the Mark IV helmet at issue for $10,000. Based on his personal knowledge of sales of other Mark IV helmets, Dr. Jamieson informed petitioner that the Mark IV helmet at issue was worth approximately $300 to $500.

Mr. Gilliam, an engineer employed in the aerospace industry, has been a collector of space helmets, suits, and other space memorabilia. At the time of the trial herein, he had over 30 helmets in his collection, two of which were Mark IV helmets. During 1985, Mr. Gilliam bought a suit and a Mark IV helmet for a total price of about $250. In November 1988, he purchased another suit and Mark IV helmet for a total price of $1,100. Shortly before Mr. Gilliam made that second purchase, a catalogue of aviation artifacts that was published in the summer of 1988 listed an identical suit and Mark IV helmet for sale at $1,300.

During his telephone conversation with petitioner that took place around 1990 or 1991, Mr. Gilliam asked petitioner for a description of the helmet that he was offering for sale. Based on petitioner's description of that helmet, Mr. Gilliam determined that the helmet petitioner was offering for sale was a Mark IV helmet, and not a space helmet as advertised by petitioner in the newspaper. Mr. Gilliam specifically inquired about the serial number on the Mark IV helmet that petitioner was offering for sale. Based on that serial number, Mr. Gilliam determined that that particular helmet had not been used for the purpose of training Mercury astronauts.

Petitioner offered to sell Mr. Gilliam the Mark IV helmet at issue for $10,000. Based on his personal knowledge of sales of other Mark IV helmets, Mr. Gilliam informed petitioner that the

Mark IV helmet at issue was worth approximately $400 to $500, and he offered to purchase it for a price within that range.

About one to two years after his initial telephone conversation with Dr. Jamieson, petitioner telephoned Dr. Jamieson and offered to sell him a Mercury helmet. Dr. Jamieson recognized the caller's voice as that of petitioner, informed petitioner that the helmet that he was offering for sale was a Mark IV helmet and not a Mercury helmet, and advised petitioner that the value of the helmet petitioner owned was approximately $400 to $500.

About two months after his initial telephone conversation with Mr. Gilliam, petitioner telephoned Mr. Gilliam. Upon discovering that he had had a prior telephone conversation with Mr. Gilliam, petitioner terminated that second telephone conversation.

During 1991, petitioner donated the Mark IV helmet that he had purchased in June 1977 to the Liberal Air Museum (museum) in Liberal, Kansas. By letter dated June 23, 1992, Stephen G. Brown, Executive Director of the museum, confirmed that that helmet was in the possession of the museum.

In his 1991 Federal income tax return (1991 return), petitioner, who had no expertise in personal property valuation, valued the Mark IV helmet that he had donated to the museum at $76,700 and claimed a charitable contribution deduction in the

amount of $19,795.[2]  Attached to petitioner's 1991 return was a report (Hetz report) that contains what purports to be the signature of Russell W. Hetz (Mr. Hetz).[3]  The Hetz report indicated that, based on the cost approach, "We recommend a Rounded Estimate [sic] Fair Market Value" for "the MARK IV United States Navy Helmet, Circa 1959" of $76,700.[4]

---

[2]  Petitioner calculated the amount of the deduction reported in his 1991 return on the basis of the claimed fair market value of the Mark IV helmet at issue, reduced to take account of the limitation prescribed in sec. 170(b)(1)(A) that the deduction not exceed 50 percent of his contribution base for 1991.

[3]  Mr. Hetz' purported resume states, inter alia, that he is "a Fee Appraiser, specializing in the market valuation of industrial machinery and transportation equipment."

[4]  The Hetz report noted, inter alia, that the various factors to be considered in determining that value included the "Sale of [a] similar Helmet."  That report further stated, with no explanation:  "WE have elected to use the Cost Approach."  It described the cost approach as an estimate of "value based on the current cost in dollars of a new replacement Property Unit of similar design, capacity, materials and utility."  The Hetz report concluded that the total design and material cost of "the MARK IV Pressure Helmet" as of the time the Hetz report was prepared was $338,000.  It then allocated that cost to the Mark IV helmet that was the subject of the Hetz report as follows:

> In order to spread the development costs for High Technology Projects such as this MARK IV Helmet, the first 2 units produced are tested to their limits, usually to destruction.  We say the subject Helmet was the first one built after the tests and we shall spread the Design and Material Cost over the First Three Units.
>
> $\frac{\$338,000}{3}$ = $112,933 [sic] Allocated Cost for the Subject Helmet.

The Hetz report adjusted that $112,933 allocated cost for depreciation using a 100-year useful life for the helmet that was the subject of that report and arrived at a recommended "Rounded Estimate [sic] Fair Market Value" of $76,700 for that helmet.

As of the date of the trial herein, a Mark IV helmet was being offered for sale for $800 by an individual in San Francisco, California.

OPINION

Petitioner bears the burden of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are strictly a matter of legislative grace, and petitioner bears the burden of proving that he is entitled to any deduction claimed. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Petitioner attempted to satisfy his burden of proof in this case principally through his testimony and the Hetz report that was attached to his 1991 return. We found petitioner's uncorroborated testimony at times questionable, general, vague, and conclusory. Under the circumstances presented here, we are not required to, and we do not, rely on petitioner's testimony to sustain his burden of establishing error in respondent's determinations. See Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). As for the Hetz report, for the reasons discussed below, we place no weight on that report.

At trial, respondent presented as an expert witness the

individual who prepared the written report that respondent timely submitted to the Court and served on petitioner as required by Rule 143(f).  We determined that that individual was not an expert qualified to opine on the fair market value of the Mark IV helmet as issue.  Respondent called two fact witnesses, Dr. Jamieson and Mr. Gilliam, who testified at trial.  We found each of them credible.[5]

---

[5]  Petitioner renews on brief his contention at trial that the testimony of respondent's witnesses, Dr. Jamieson and Mr. Gilliam, should be excluded because their identity was omitted from respondent's trial memorandum dated Jan. 5, 1995, and, as a result of that omission, he did not have the opportunity to prepare for the testimony of those witnesses.  The identity of respondent's witnesses, Dr. Jamieson and Mr. Gilliam, was disclosed to petitioner, inter alia, in an amendment to trial memorandum for respondent dated Jan. 12, 1995 (respondent's amendment to trial memorandum).  Petitioner was aware of the identity of those witnesses almost two weeks before the trial herein, made no effort to ascertain their whereabouts, did not ask respondent how he could contact them, and chose not to contact them.  We reaffirm our finding at trial that under those circumstances petitioner's ability to present his case was not prejudiced by respondent's calling Dr. Jamieson and Mr. Gilliam as witnesses.

Petitioner also renews on brief his suggestion at trial that this Court should not rely on the testimony of Dr. Jamieson and Mr. Gilliam because they were not credible.  The determination of the credibility of witnesses is a question of fact that is within our discretion.  Friedman v. Commissioner, 235 F.2d 86 (6th Cir. 1956), affg. T.C. Memo. 1954-198.  As noted above, we found each of respondent's two fact witnesses credible.

Petitioner also renews on brief his contention at trial that the testimony of respondent's witness, Dr. Jamieson, should be excluded because it was beyond the scope of testimony stated in respondent's amendment to trial memorandum.  Petitioner also objects on brief to the testimony of respondent's witness, Mr. Gilliam, on the same grounds.  Petitioner's contentions about the

(continued...)

## Charitable Contribution Deduction

Section 170(a) provides that a taxpayer is entitled to a deduction for any charitable contribution as defined in section 170(c) that is made during the taxable year. If a charitable contribution is made in property other than money, the amount of the contribution is generally the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. The fair market value of property is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.

The parties do not dispute that petitioner contributed the

---

[5](...continued)
scope of testimony of Dr. Jamieson and Mr. Gilliam are unfounded. Respondent's amendment to trial memorandum stated that Dr. Jamieson and Mr. Gilliam would testify with respect to the respective telephone conversations that they had had with petitioner concerning the Mark IV helmet at issue. Dr. Jamieson and Mr. Gilliam testified about what transpired during those respective telephone conversations, including their respective views as to the fair market value of the Mark IV helmet at issue and the basis for those views. Much of the testimony about which petitioner appears to complain was elicited by him as a result of questions he asked on cross-examination and recross-examination of those witnesses.

Even assuming arguendo that we were to exclude from the record the testimony of respondent's witnesses, Dr. Jamieson and Mr. Gilliam, that record would contain no reliable evidence from which we would have been able to find that petitioner satisfied his burden of showing error in respondent's determination that he did not substantiate the fair market value of the Mark IV helmet at issue that he claimed in his 1991 return.

Mark IV helmet at issue to the museum.  Nor do they dispute that the museum qualifies as a charitable organization.  The only dispute is the fair market value of that helmet.

Petitioner contends that, as of the date he donated the Mark IV helmet at issue to the museum, its fair market value was $76,700.  Respondent determined in the notice of deficiency she issued to petitioner for 1991 that petitioner did not substantiate the charitable contribution deduction he reported in his 1991 return that was based on that claimed value.  On brief, respondent contends that, based on the record in this case, the fair market value of the Mark IV helmet at issue was between $300 and $500 as of the time petitioner donated it to the museum.

The fair market value of property that is the subject of a charitable contribution is an issue of fact to be determined from an examination of the entire record.  Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984).  In arriving at that determination, the Court will weigh its judgment heavily against the taxpayer who is responsible for any deficiencies in the proof required to substantiate the value claimed. Id.

The only testimonial evidence relating to petitioner's claimed valuation of the Mark IV helmet at issue is petitioner's testimony.  As stated above, we are unwilling to rely on that testimony.  Even assuming arguendo that we were willing to rely

on petitioner's testimony, we do not believe that it establishes error in respondent's determination regarding the charitable contribution deduction claimed with respect to the Mark IV helmet at issue.

The principal documentary evidence on which petitioner relies to support his contention as to the fair market value of the Mark IV helmet at issue is the Hetz report that was attached to his 1991 return. We do not place any weight on that report in determining the fair market value of that helmet. Petitioner did not intend or attempt to call Mr. Hetz, who purportedly signed and prepared that report, as a witness at trial.[6] Mr. Hetz was not even present at the trial herein. Thus, we are left with a report that was attached to petitioner's 1991 return, that contains what purports to be the signature of Mr. Hetz, and that,

---

[6] Respondent timely submitted the written report of her proffered expert as required by Rule 143(f) and the Court's standing pretrial order. Petitioner did not timely submit a written report prepared by Mr. Hetz or any other proffered expert. On Jan. 3, 1995, the Court had a telephonic, pretrial conference with the parties for the purpose of confirming that petitioner did not intend to introduce expert testimony at trial, since he had not submitted a written report as required by Rule 143(f) and the Court's standing pretrial order not later than 30 days before Jan. 23, 1995, the date on which this case was to be called from the trial calendar. The Court informed petitioner during that telephonic conference that since no such written report had been timely submitted, he could not introduce expert testimony at trial unless he were to file, and the Court were to grant, a motion seeking the Court's permission to submit out of time a written report pursuant to Rule 143(f). Petitioner did not at any time file such a motion.

on its face, is both ambiguous and suspect. We do not even know whether the Mark IV helmet that was the subject of the Hetz report is in fact the Mark IV helmet at issue here. Nor can we determine solely on the basis of the document in the record that purports to be Mr. Hetz' resume whether Mr. Hetz was qualified to prepare the report that was attached to petitioner's 1991 return. In this connection, since petitioner did not offer Mr. Hetz as a witness at trial, respondent did not have the opportunity to voir dire Mr. Hetz on his qualifications as an expert or to examine him on the Hetz report, nor did the Court have the opportunity to question him about his qualifications as an expert in valuing the Mark IV helmet at issue or about the Hetz report. It is also significant that the Hetz report does not set forth in detail the reasons for its recommendation that a "Rounded Estimate [sic] Fair Market Value" for the Mark IV helmet that was the subject of the report be $76,700. For example, the Hetz report offers no explanation as to why the cost approach on which the report purports to rely is the most appropriate method to use in determining the fair market value of the Mark IV helmet that was the subject of that report. By way of further illustration, although the Hetz report acknowledged that various factors, including the "Sale of [a] similar Helmet", were to be taken into account, apparently that factor was not considered, and the Hetz report provides no explanation as to why it was ignored.

In sum, petitioner has presented no reliable evidence to establish that the fair market value of the Mark IV helmet at issue was $76,700 at the time he donated it to the museum.[7] Based on our examination of the entire record before us, we find that petitioner has failed to satisfy his burden of proving that the Mark IV helmet at issue had a fair market value of $76,700 at that time. We further find on that record that the fair market value of that helmet at the time he donated it to the museum was $500.

Self-Employment Tax

Petitioner presented no evidence and makes no argument regarding his liability for self-employment tax for 1991. We note that petitioner's failure to pay self-employment tax for 1988 was an issue raised in this Court in Droz v. Commissioner, an Oral Opinion of this Court dated Oct. 14, 1992. In that case, petitioner challenged the constitutionality of section 1402(g)(1) to the extent that it provided that a self-employed individual who raised religious objections to the social security system but who did not belong to a religious organization was not entitled to an exemption from self-employment tax. In our Oral Opinion, we rejected petitioner's constitutional challenge. Petitioner

---

[7] Petitioner provided no credible explanation as to why that helmet, which he purchased for $100 in June 1977, would have so substantially appreciated in value to $76,700 approximately 14 years later. See Tripp v. Commissioner, 337 F.2d 432, 434-435 (7th Cir. 1964), affg. T.C. Memo. 1963-244.

appealed our decision to the U.S. Court of Appeals for the Ninth Circuit, and that appeal was pending at the time of the trial herein. After the present case was submitted, the Court of Appeals rendered its decision upholding the constitutionality of section 1402(g)(1), affirming this Court's decision, and holding petitioner liable for self-employment tax for 1988. Droz v. Commissioner, 48 F.3d 1120 (9th Cir. 1995), affg. an Oral Opinion of this Court, cert. denied, ___ U.S. ___, 64 U.S.L.W. 3167 (Jan. 8, 1996).

On the record before us, we sustain respondent's determination that petitioner is liable for 1991 for self-employment tax. Droz v. Commissioner, supra.

Accuracy-Related Penalty

Respondent determined that petitioner is liable for 1991 for the accuracy-related penalty under section 6662(a) because his underpayment of tax for that year was due to negligence or disregard of rules or regulations. For purposes of section 6662(a), the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, failure to exercise due care, or failure to do what a reasonable person would do under the circumstances. Sec. 6662(c); Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990). The term "disregard"

includes any careless, reckless, or intentional disregard of the
Code and the temporary or final regulations issued under the
Code.  Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

The accuracy-related penalty under 6662(a) does not apply to
any portion of an underpayment if it is shown that there was a
reasonable cause for such portion and that the taxpayer acted in
good faith with respect to such portion.  Sec. 6664(c)(1).  The
determination of whether the taxpayer acted with reasonable cause
and in good faith depends upon the pertinent facts and circum-
stances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Factors taken
into account include the taxpayer's efforts to assess his or her
proper tax liability and the knowledge and experience of the
taxpayer.  Id.  Reliance on the advice of a professional, such as
an accountant or an appraiser, does not necessarily demonstrate
reasonable cause and good faith unless, under all the circumstan-
ces, such reliance was reasonable and the taxpayer acted in good
faith.  Id.

Although petitioner's argument is not entirely clear, he
appears to contend that he was not negligent in the preparation
of his 1991 return because the claimed charitable contribution
deduction was based on the advice of his accountant who prepared
that return and on the advice of Mr. Hetz who, he claims, pre-
pared the report attached to his 1991 return that indicated that
the fair market value of the Mark IV helmet that was the subject

of that report was approximately $76,700.

With respect to petitioner's reliance on the accountant who prepared his 1991 return, petitioner did not call him as a witness. Thus, the record is devoid of any evidence relating to what information petitioner may have provided him or what advice he might have given petitioner with regard to the value placed on the helmet at issue for purposes of the charitable contribution deduction at issue. Based on our review of the instant record, we find that petitioner has failed to establish that his reliance on the advice of the return preparer was reasonable or that he acted in good faith.

With respect to petitioner's reliance on Mr. Hetz, petitioner did not call him as a witness. Thus, the record is devoid of any evidence relating to what information petitioner may have provided to Mr. Hetz about the Mark IV helmet that Mr. Hetz was asked to value. Nor does the record contain any reliable evidence establishing, inter alia, (1) that Mr. Hetz was qualified in appraising personal property of the type at issue, (2) that the Mark IV helmet that was the subject of the Hetz report is the Mark IV helmet at issue, (3) why Mr. Hetz employed the cost approach in arriving at the fair market value of the Mark IV helmet that was the subject of the Hetz report, or (4) why Mr. Hetz did not consider the "Sale of [a] similar Helmet." We also note that around 1990 or 1991, shortly before petitioner donated

the Mark IV helmet at issue to the museum, petitioner offered to sell that helmet to Dr. Jamieson and to Mr. Gilliam for $10,000. Both Dr. Jamieson and Mr. Gilliam informed petitioner that the helmet that he was offering for sale was a Mark IV helmet, and not a space helmet, and that it was worth approximately $300 to $500. Petitioner's offer to sell the Mark IV helmet at issue for $10,000 indicates that he was aware that a value of $76,700 for that helmet was grossly overstated. In addition, he was aware that, at least as far as Dr. Jamieson and Mr. Gilliam were concerned, a value of $76,700 for the helmet at issue was very substantially overstated. Based on our review of the present record, we find that petitioner has failed to establish that his reliance on the advice of Mr. Hetz was reasonable or that he acted in good faith. See <u>Van Zelst v. Commissioner</u>, T.C. Memo. 1995-396; <u>Harding v. Commissioner</u>, T.C. Memo. 1995-216.

On the record before us, we find that petitioner has not established that he acted with reasonable cause and in good faith in placing a value of $76,700 on the Mark IV helmet at issue. We therefore sustain respondent's determination for 1991 imposing the accuracy-related penalty on petitioner.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.