T.C. Memo. 1997-93


UNITED STATES TAX COURT


THOMAS M. AND CHRISTINE A. FRIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23232-93.                    Filed February 24, 1997.

Corp. was organized in 1987 with $900 in capital
contributions, of which amount H contributed $300.
Shortly thereafter, H advanced an additional $74,700 to
Corp. and received in return a fully enforceable,
unsecured note with a set monthly repayment schedule.
No payment of principal or interest was ever made on
the note by Corp.  In 1989, Ps deducted the entire
amount of the advance as a business bad debt under sec.
166, I.R.C.  R disallowed the deduction completely,
determining that the advance was a capital contribution
and not a loan.  On the facts, <u>Held</u>:  The advance H
made to Corp. constituted a contribution to capital
and, therefore, Ps are not entitled to claim a bad debt
deduction under sec. 166, I.R.C.  <u>Held</u>, <u>further</u>, R's
determination that Ps are liable for the accuracy-
related penalty under sec. 6662(a), I.R.C., for a
substantial understatement of tax is sustained.

Thomas M. Fries and Christine A. Fries, pro sese.

Amy A. Campbell, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the tax year ended December 31, 1989, in the amount of $19,728. Respondent also determined that petitioners are liable for an accuracy-related penalty of $3,946 pursuant to section 6662(a) for 1989. (Petitioner Christine A. Fries is a party to this proceeding solely because she filed a joint return with her husband, and the term petitioner will be used henceforth to refer to Thomas M. Fries.)

All section references are to sections of the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are as follows:

(1) Whether petitioners are entitled to a claimed bad debt deduction of $75,000 for 1989. We hold that they are not.

(2) Whether petitioners are liable for the accuracy-related penalty under section 6662(a) for a substantial understatement of tax. We hold that they are.

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Dunwoody, Georgia, when they filed their petition.

FINDINGS OF FACT

Petitioner, along with his wife and mother, incorporated National Travel Management, Inc. (National), in December 1986 in order to start a retail travel business. They became the corporation's initial officers and shareholders. In February 1987, an erstwhile coworker, Fred Burkhalter (Burkhalter), approached petitioner and indicated his interest in entering the travel business as well. Burkhalter informed petitioner that he knew others who were eager to invest in such a venture. After careful consideration, talks commenced between petitioner and these individuals, and a deal was struck.

Upon completion of the negotiations, the stock of National was held as follows: 33 percent by petitioner; 11 percent by Jim Brands (Brands); 22 percent by Bob Tucker (Tucker) or Tavistock (a Georgia general partnership of which Tucker was the general partner); and 33 percent by Burkhalter. A total of $900 was contributed for the stock of National, of which amount petitioner paid $300. Petitioner was named president of National.

On May 27, 1987, petitioner, acting as president of National, executed a note to himself in his individual capacity (the Fries note) in the amount of $74,700. The Fries note called for 120 installments of principal and interest in the amount of $946.29 each. The first payment was due on June 28, 1987, with each subsequent installment due on the 28th day of each month thereafter, through May 1997. Petitioner did not insist on

National's establishing a sinking fund or reserve for the payment of principal and interest on the Fries note, and the note was not secured.

Concurrently with the execution of the Fries note, Brands advanced $24,900 as a "loan" to National and in exchange therefor received a note on terms similar to the Fries note. Either Tucker or Tavistock also advanced funds to National of $49,800 at this time under similar terms. Burkhalter did not make such an advance to National. Immediately after the advances, National had a debt to equity ratio of 166 to 1 ($149,400 notes to $900 equity). From the start, the expectation of the shareholders was that the operations would generate the cash profits to repay the advances.

On the same day that National received the advances, petitioner conveyed an interest in his house to Tavistock in exchange for $75,000. Petitioner understood that, as a condition of his employment with National, he was required to infuse capital into the company. However, he did not have any cash on hand, nor was he in a position to risk substantial amounts of money at the time. Therefore, he mortgaged his residence to Tavistock and contributed the proceeds to National. National issued the Fries note in return for that infusion of cash.

Shortly after these transactions were completed, National acquired an operating travel agency from Clark Howard (Howard), called Action Travel (Action), for roughly $200,000. National

paid approximately $50,000 in cash as a downpayment; the rest of the purchase price was reflected in a note held by Howard (the Action note). Petitioner assumed personal liability as guarantor for the Action note, which was restructured a short time later to reduce the amount of the payments National was required to make. The money used to acquire Action came from the advances made by petitioner and the others. The purchase of Action was contemplated by National's shareholders at the time of their advances and in part prompted them to make the advances, as did the need to meet basic operating costs.

National never made a payment of principal or interest on the Fries note. Petitioner never requested repayment or granted a deferment on the note. Petitioner could not by his own efforts repay the obligation of National to himself since all checks issued by National required two signatures. However, National did make periodic payments on the Action note, and petitioner signed those checks with another officer even after National had defaulted on his own note. From 1987 to 1990, National paid approximately $100,000 on the Action note before defaulting on that obligation as well.

National's failure to pay on the Fries note effected a difficult financial situation for petitioners. In May 1988, they were forced to sell their house. In 1989, in order to make ends meet, petitioner stepped down as president of National, which by

that point was also having trouble paying salaries to him and Burkhalter. He found another job with a competing travel organization.

After leaving National's employ, petitioner explored the possibility of collecting on the Fries note. He discussed the matter with his attorney, Edwin W. King (King). In a letter dated March 22, 1990, King wrote that, under the circumstances, he was unwilling to undertake collection proceedings against National.

Pursuant to the letter from King, and after petitioner consulted with his accountants, petitioners claimed a $75,000 bad debt deduction on their 1989 return. Petitioners included the $300 initially paid for the National stock in the deduction.

On February 5, 1993, petitioners signed a Consent to Extend the Time to Assess Tax for 1989, extending the period of limitations until April 15, 1994. Respondent issued a statutory notice of deficiency to petitioners for 1989 on August 11, 1993, completely disallowing petitioners' claimed bad debt deduction.

After filing a lawsuit against National in 1993, petitioner was awarded a consent judgment on the Fries note by the State Court of Dekalb County in the amount of $123,255 ($74,700 principal and $41,085 interest, and attorney's fees) on January 10, 1994. On February 7, 1994, the shareholders of National (except petitioner) held a meeting. At that time, they voted to

issue petitioner 4,550 shares of Action and 56 shares of Caldwell Group, Ltd. (a partially owned subsidiary of National acquired after petitioner's departure) in a general distribution of National's assets in partial satisfaction of its creditors.

OPINION

We must adjudge whether petitioners are entitled to a bad debt deduction under section 166 in 1989 for the $74,700 advance petitioner made to National in 1987.  (The additional $300 petitioners claimed on their return represents the sum petitioner paid for his stock in National.  This amount is, therefore, ineligible for a section 166 deduction.  Sec. 1.166-1(c), Income Tax Regs.)  We must also decide whether petitioners are liable for an accuracy-related penalty under section 6662(a) for a substantial understatement of income tax during 1989.

Issue 1.  Whether Petitioners Are Entitled to a Section 166 Bad Debt Deduction

Section 166(a)(1) provides that a deduction shall be allowed for "any debt which becomes worthless within the taxable year." However, section 166 distinguishes business bad debts from their nonbusiness counterparts.  Sec. 166(d); sec. 1.166-5(b), Income Tax Regs.  Business bad debts may be deducted against ordinary income whether wholly or partially worthless during the year (to the extent charged off during the tax year as partially worthless debts).  Sec. 1.166-3, Income Tax Regs.  Nonbusiness bad debts may be deducted, but only if they are entirely worthless in the

year claimed; they are, moreover, subject to the same limitations that apply to short-term capital losses.  Sec. 166(d).

A deduction for a bad debt is limited to a bona fide debt. Sec. 1.166-1(c), Income Tax Regs.  A bona fide debt arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money.  "A * * * contribution to capital shall not be considered a debt for purposes of section 166."  Sec. 1.166-1(c), Income Tax Regs; see In re Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976); Kean v. Commissioner, 91 T.C. 575, 594 (1988).

Petitioners assert that the advance at issue constitutes a business debt which became entirely worthless during 1989. Consequently, they posit, they are entitled to fully deduct the loss against ordinary income during that year.  On the other hand, respondent makes the following alternative arguments: First, the advance does not constitute debt, but equity.  Second, if a valid debtor-creditor relationship did exist between National and petitioner with respect to the amount in question, then any loss is not deductible in 1989 because the debt was not worthless in that year.  Finally, respondent maintains that if the debt was worthless in 1989, it was a nonbusiness rather than a business bad debt, deductible only to the extent permitted under section 166(d).

Characterization of an advance as either a loan (debt) or capital contribution (equity) is a question of fact which must be

answered by reference to all of the evidence, with the burden on the taxpayer to establish that the advance was a loan. Rule 142(a); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980); Yale Avenue Corp. v. Commissioner, 58 T.C. 1062, 1073-1074 (1972). Advances to a closely held corporation by its shareholders are subject to particular scrutiny, since "The absence of arm's-length dealing provides the opportunity to contrive a fictional debt shielding the real essence of the transaction and obtaining benefits unintended by the statute." Gilboy v. Commissioner, T.C. Memo. 1978-114. Thus, we look beyond the form of the transaction to determine its true substance.

Courts have identified and considered various factors in deciding questions of debt versus equity. See, e.g., In re Uneco, Inc., supra at 1207-1208 (10 factors); Fin Hay Realty Co. v. United States, 398 F.2d 694, 696 (3d Cir. 1968) (16 factors). The Court of Appeals for the Eleventh Circuit, to which an appeal of this case would lie, has adopted the objective factors set forth in Estate of Mixon v. United States, 464 F.2d 394 (5th Cir. 1972). See In re Lane, 742 F.2d 1311 (11th Cir. 1984); Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634 (11th Cir. 1984), affg. T.C. Memo. 1982-314.

In Estate of Mixon, the Court of Appeals for the Fifth Circuit delineated the following 13 elements which merit consideration in determining whether an advance constitutes debt

or equity: (1) The name given to the certificate evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result of the advance; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. Estate of Mixon v. United States, supra at 402.

In weighing the evidence favoring characterization of the advance as debt or equity, we recognize that the various factors are not of equal significance, and that no one factor is controlling. John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946); Estate of Mixon v. United States, supra at 402. This Court considers the ultimate inquiry to be: "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973). We view the transaction as of the time the note was issued and not when

petitioner's employment relationship or National's future prospects turned sour.  See Mayhew v. Commissioner, T.C. Memo. 1994-310.

Due to the myriad factual circumstances under which debt-equity questions can arise, not all of the factors are necessarily relevant to each case.  Dixie Dairies Corp. v. Commissioner, supra at 493-494.  We shall discuss below only those factors germane to the disposition of the instant matter.

    1.  Name Given to the Certificate
    2.  Presence or Absence of a Fixed Maturity Date

"[T]he issuance of a bond, debenture, or note is indicative of a bona fide indebtedness."  Estate of Mixon v. United States, supra at 403.  Also, the presence of a definite maturity date indicates a fixed obligation to repay, which is characteristic of a debt obligation.  Id. at 404.  Here, the note issued to petitioner had a set monthly repayment schedule, which militates in favor of debt.

    3.  Source of the Payments

If repayment is possible only out of corporate earnings, the transaction resembles a capital contribution; if repayment does not hinge on earnings, the transaction reflects a loan.  Id. at 405; Leuthold v. Commissioner, T.C. Memo. 1987-610.  In this case, immediate repayment was not available from National's existing assets, as National had virtually no resources.  The amount due each month on the Fries note exceeded National's

entire capital base of $900. No sinking fund or reserve existed to insure repayment of the advance. Instead, the shareholder contributors expected to be repaid out of earnings from National's operations.

4. Right to Enforce Payment

If a fixed obligation to repay the advance exists, the transaction is indicative of a loan. Estate of Mixon v. United States, supra at 405. Such an obligation is present in the instant case. However, while petitioner's note was fully enforceable, he took none of the customary steps to assure repayment in the event the business failed. No sinking fund was established, and the note lacked even a modicum of security to protect petitioner at least against the claims of unsecured creditors or subsequent lienholders. Moreover, other than petitioner's self-serving testimony, no evidence was presented that he ever demanded repayment of the note.

This case is distinguishable from Baldwin v. Commissioner, T.C. Memo. 1993-433, in which a partnership had experienced such success in its first 9 months of operation that the taxpayer was understandably not concerned with repayment of the advances he made in the short term. Here, there was no early indication of success on the part of National. In fact, the evidence all points to the fact that "from day one, the business went downhill". While the Court recognizes that petitioner's concern for his job might have made him reluctant to badger the other

shareholders for repayment of the putative loan when their
relationship began to deteriorate, there was no evidence of any
requests for repayment by petitioner.  See Davies v.
Commissioner, 54 T.C. 170, 176 (1970).  Moreover, nothing
explains petitioner's failure to avoid the problem in the first
place by either securing the note or by setting up a sinking
fund.

   5.  Status of the Contribution in Relation to Regular
   Corporate Creditors

   Subordination of a putative loan to that of another creditor
typifies a contribution to capital.  Tomlinson v. 1661 Corp., 377
F.2d 291, 297-298 (5th Cir. 1967).  National repaid about
$100,000 on the Action note, but failed to pay anything at all on
the previously executed Fries note.  While the terms of the Fries
note did not mention subordination, petitioner acquiesced in a de
facto subordination by failing to demand repayment while
continuing to sign checks for the Action note.  See Smithco
Engg., Inc. v. Commissioner, T.C. Memo. 1984-43.

   6.  Intent of the Parties

   The intent of the parties weighs heavily in determining the
debt versus equity question, but subjective intent does not
suffice to alter the relationship or duties created by an
otherwise objectively indicated intent.  In re Lane, 742 F.2d at
1311.  Conclusory and self-serving statements by taxpayers that
they intended to create debts have been accorded little weight by

the courts.  The Court of Appeals for the Fifth Circuit has stated:

> Primary reliance upon subjective indications of intent is simply not an effective way of resolving * * * [the debt versus equity] problem.  In a land of hard economic facts, we cannot root important decisions in parties' pious declarations of intent.  * * * [Texas Farm Bureau v. United States, 725 F.2d 307, 314 (5th Cir. 1984).]

Thus, we must look not simply at the pronouncements of the parties, but also at the circumstances surrounding the transaction to reveal their intent.  Tyler v. Tomlinson, 414 F.2d 844, 850 (5th Cir. 1969).  If a corporation does not make required payments or a shareholder does not enforce his right to receive payments, an advance appears more like equity than debt.  Ambassador Apartments, Inc. v. Commissioner, 50 T.C. 236, 246 (1968), affd. 406 F.2d 288 (2d Cir. 1969).

In the instant case, petitioner stated in his brief that "The terms and conditions of the second mortgage and the loan were identical.  By the nature of this obligation it is clear that the debt was obviously a loan and not a contribution to any equity."  However, the underlying note detailing the mortgage's terms is not part of the record.  (While Brands expressed general knowledge of a mortgage on petitioner's residence held by Tavistock, he was not aware of the specifics of that transaction.)

Even if petitioner subjectively intended to make a loan, the circumstances surrounding the advance point to a contribution to

capital. Petitioner never formally demanded repayment. Despite engaging in a restructuring of the Action note, he advocated no similar measure for his note. National also did not appear to treat the contribution as a debt inasmuch as no payment of principal or interest ever occurred, it did not request a deferment, and it effectively subordinated the note to the Action note. Cf. Dallas Rupe & Son v. Commissioner, 20 T.C. 363, 369-370 (1953) ("here a debt was owed to petitioners by the symphony and was definitely so recognized by all parties concerned."). In any event, National's books or tax returns are not in evidence to prove it viewed the advance otherwise.

The only indication that National ever regarded petitioner as a creditor came at a shareholders' meeting after the consent judgment had been entered against it in early 1994. At that time, the shareholders voted to satisfy petitioner's claim by awarding him stock in National's subsidiary corporations. However, this does not necessarily evince National's intent at the time the advance was made. Furthermore, the fact that petitioner won a judgment in State court for the amount of principal plus interest owing on the note does not dictate that the advance must be deemed a loan for Federal tax purposes. See Road Materials, Inc. v. Commissioner, 407 F.2d 1121, 1124 n.3 (4th Cir. 1969), ("It does not follow * * * that an advancement qualifying as a debt under state law must be treated as a debt

under the Internal Revenue Code."), affg. in part, vacating in part and remanding T.C. Memo. 1967-187.

In addition, petitioner could not have realistically expected repayment at the time he made the advance in light of National's financial condition. Petitioner's contribution was made during the early stages of the corporation's operations. See Leuthold v. Commissioner, T.C. Memo. 1987-610. A demand by petitioner for repayment would have jeopardized the future success of the corporation on which his continued employment depended. See Davis v. Commissioner, 69 T.C. 814, 836 (1978).

7. "Thin" or Adequate Capitalization

An advance to a corporation appears to be equity if the corporation is thinly capitalized. American Offshore, Inc. v. Commissioner, 97 T.C. 579, 604 (1991). No specific ratio of debt to equity determines whether a corporation is adequately capitalized. 2554-58 Creston Corp. v. Commissioner, 40 T.C. 932, 937 n.3 (1963). However, this Court has held that debt to equity ratios of 800 to 1, American Offshore, Inc. v. Commissioner, supra at 604; 205 to 1, 2554-58 Creston Corp. v. Commissioner, supra at 937; and 123 to 1, Ambassador Apartments, Inc. v. Commissioner, supra at 245, indicated inadequate capitalization.

This case closely parallels Thompson v. Commissioner, 73 T.C. 878 (1980). In Thompson, this Court held that the subject advances of $20,000 were contributions to capital where a business had been incorporated with a minimal capital

contribution of $500 and the subsequent advances were apparently its only other source of funds. Id. at 894-895. Here, National had a capital base of $900, with a debt to equity ratio of roughly 166 to 1. As in Thompson, insufficient capital existed to fund National's operations at the time of petitioner's advance. See also Tyler v. Tomlinson, supra at 848-849.

8. Identity of Interest Between Creditor and Stockholder

If stockholders make advances in proportion to their respective stock ownership, a capital contribution is indicated. Estate of Mixon v. United States, 464 F.2d at 409. Petitioner owned 33 percent of National's stock and contributed $74,700 to the corporation. Brands, who owned 11 percent of the stock, contributed precisely one-third of that amount, or $24,900. A 22-percent shareholder (the record is unclear whether Tucker or Tavistock) contributed exactly two-thirds of the amount of petitioner's advance, or $49,800. Although Burkhalter did not make an advance, at the time the stock was originally distributed the parties had apparently agreed to exempt him from making further monetary contributions.

9. Ability To Obtain Loans From Outside Lending Institutions

If an ordinary reasonable creditor would not lend funds to a corporation when funds are advanced by a shareholder, the advance is more likely to be equity. Estate of Mixon v. United States, 464 F.2d at 410; American Offshore, Inc. v. Commissioner, supra

at 605.  We look to whether the terms of the purported debt were a "patent distortion of what would normally have been available" to the debtor in an arm's-length transaction.  Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. at 379.

Petitioner made an advance to National without securing it. While he alleged that travel agencies were routinely financed in such a manner by outside lending institutions, we doubt this occurs without some type of security, especially in light of National's recent incorporation and financial straits.  See Thompson v. Commissioner, supra at 895.  Thus, petitioner failed to act as a reasonable creditor with respect to an undercapitalized nascent enterprise.  Rather, the advance was placed at the risk of National's business.

10.  Extent to Which the Advance Was Used To Acquire Capital Assets

Generally, the fact that an advance is used to satisfy the daily operating needs of a corporation indicates a bona fide indebtedness, whereas an advance resembles equity if it is used to acquire capital assets.  Estate of Mixon v. United States, 464 F.2d at 410.  However, advances to new firms that were initially capitalized inadequately also resemble equity even though the advances may be used to meet basic operating costs.  See Texas Farm Bureau v. United States, 725 F.2d at 314; Gilboy v. Commissioner, T.C. Memo. 1978-114.  In the instant case, newly incorporated National used a portion of the advance to purchase

"necessary first assets".  <u>Texas Farm Bureau v. United States</u>, 725 F.2d at 314.  Moreover, National also used the advance to acquire Action, a capital asset.

11.  <u>Failure of the Corporation To Repay on the Due Date or Seek a Postponement</u>

The Court of Appeals for the Eleventh Circuit stated in <u>In re Lane</u> that "This factor and the * * * intent of the parties factor are, we believe, the most telling of the <u>Mixon</u> factors". <u>In re Lane</u>, 742 F.2d at 1317.  National made no attempt to repay its obligation to petitioner, nor did it ever seek to defer payment or restructure the note as it did with the Action note. See <u>Tyler v. Tomlinson</u>, 414 F.2d at 849.

Having applied the foregoing factors to the facts of this case, and after careful consideration of those factors which support opposing conclusions, we think it is evident that the advance was a contribution to capital and not a bona fide debt. Whatever petitioner's subjective intent regarding the contribution at issue, the preceding analysis demonstrates that he could not reasonably have expected repayment on the terms of the Fries note at the time it was executed.  Moreover, his intent did not comport with that of National, or with the economic reality of creating a true debtor-creditor relationship.  We hold, therefore, that petitioners may not claim a bad debt deduction under section 166 for the advance petitioner made to

National.  Our conclusion obviates the need to address respondent's alternative positions regarding this issue.

Issue 2.  Whether Petitioners Are Liable for the Section 6662 Accuracy-Related Penalty for a Substantial Understatement of Tax

Respondent determined that petitioners are liable for the accuracy-related penalty under section 6662(a) for 1989.  Section 6662, which is applicable to returns due after December 31, 1989, imposes a penalty in an amount equal to 20 percent of the underpayment of tax resulting from a substantial understatement of tax.  Sec. 6662(a).  Petitioners bear the burden of proving that respondent's determination is erroneous.  Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

An understatement is equal to the excess of the amount of tax required to be shown in the return less the amount of tax shown in the return.  Sec. 6662(d)(2)(A).  An understatement is substantial in the case of an individual if it exceeds the greater of 10 percent of the tax required to be shown in the return or $5,000.  Sec. 6662(d)(1)(A).  An understatement is reduced to the extent it is based on substantial authority, or adequately disclosed in the return or in a statement attached thereto.  Sec. 6662(d)(2)(B).

The accuracy-related penalty under section 6662 does not apply with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion of the underpayment and that the taxpayer acted in good faith with

respect to such portion. Sec. 6664(c)(1); <u>Tippin v. Commissioner</u>, 104 T.C. 518, 533-534 (1995). In general, the determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The crucial factor is the extent of the taxpayer's effort to assess his proper tax liability. <u>Id.</u>

Petitioners make no argument that they had substantial authority, or that they adequately disclosed the relevant facts, with respect to the deduction on their tax return. However, petitioners do summarily opine that they should not be liable for the section 6662(a) penalty insofar as petitioner "acted under the advice of Attorneys and Certified Public Accountants".

Reliance on professional tax advice constitutes reasonable cause only if the taxpayer acted in good faith and made full disclosure of all relevant facts to the adviser. See <u>Paula Constr. Co. v. Commissioner</u>, 58 T.C. 1055, 1061 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); sec. 1.6664-4(b), Income Tax Regs. Petitioners did not call any of petitioner's lawyers or accountants as witnesses. Thus, no evidence has been proffered pertaining to the information petitioner may have provided them in soliciting their advice. See <u>Droz v. Commissioner</u>, T.C. Memo. 1996-81. While the record includes a letter from King in which he concludes that the "debt"

is uncollectible, petitioner has not established whether he fully divulged all relevant facts to King.

Based on our review of the record, we find that petitioners have failed to demonstrate that petitioner's reliance on the advice of his lawyers and accountants was reasonable or that he acted in good faith.  Accordingly, we sustain respondent's determination that petitioners are liable for the accuracy-related penalty with respect to the entire underpayment for 1989.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.