T.C. Memo. 2012-118

UNITED STATES TAX COURT

PATRICK A. REESINK AND JILL MITCHEL REESINK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2475-10.                     Filed April 23, 2012.

<u>Woodford Gregory Rowland</u>, for petitioners.

<u>Chong S. Hong</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined a deficiency in petitioners' 2005

joint Federal income tax of $184,349 and a section 6662(a)[1] accuracy-related

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue
Code (Code) in effect for the year in issue, and all Rule references are to the Tax
Court Rules of Practice and Procedure.

penalty of $36,870. After concessions, the issues remaining for decision are:

(1) whether petitioners' sale of rental property followed by their purchase of real estate qualifies as a section 1031 like-kind exchange. We hold that it does;

(2) whether $60,000 paid to petitioners in settlement of a lawsuit is taxable income to petitioners. We hold that it is; and

(3) whether petitioners are liable for the section 6662(a) accuracy-related penalty in regard to the underpayment resulting from the like-kind exchange, the settlement proceeds, underreported rental income,[2] and travel expenses.[3] We hold that they are liable for the section 6662(a) penalty on portions of the underpayment associated with the settlement proceeds, rental income, and travel expenses.

## FINDINGS OF FACT

Petitioners resided in California at the time their petition was filed. They married on September 1, 2000, and have two children--Patrick Reesink's son from a

---

[2]Petitioners concede that they underreported $16,392 of rental receipts. However, they contest whether they should be liable for the associated sec. 6662(a) accuracy-related penalty.

[3]Petitioners originally contested respondent's disallowance of $1,124 of travel expenses. Petitioners now concede that they are unable to substantiate these travel expenses.

prior marriage (born in March 1991) and an adopted son (born in January 1996 and adopted July 25, 2007).[4]

Mr. Reesink was born and raised in San Francisco, California. In the 1970s, he began working as a butcher and station cook for the Bohemian Club.[5] Mr. Reesink also worked for the Bohemian Grove every summer. In 2000 he bought a trailer near the Bohemian Grove so that he would have a place to stay while working there during the summer months. Mr. Reesink continued working for the Bohemian Club and the Bohemian Grove until 2003 when he began to suffer from a blood clot in his left ankle. He was declared permanently disabled by the Social Security Administration as of April 4, 2004, and he began receiving monthly disability benefits of approximately $1,700 in March 2006. Mr. Reesink was unable to continue working for the Bohemian Club and the Bohemian Grove as a result of his disability. Petitioners' wages decreased from $45,470 in 2002, to $24,671 in

---

[4]Petitioners were in adoption proceedings with respect to their adopted son after they had physical custody in 1999. Mr. Reesink's son from his prior marriage lives primarily with his biological mother. Mr. Reesink has been responsible for paying approximately $490 per month in child support since 1991.

[5]The Bohemian Club is a private men's club in San Francisco, California, which owns the Bohemian Grove. The Bohemian Grove is a 2,700-acre campground near Guerneville, California.

2003, $10,105 in 2004, $3,776 in 2005, and zero in 2006. Moreover, Mrs. Reesink did not earn any wages during 2004, 2005, and 2006.

I. The Reesink Brothers

In 1985 brothers Patrick and Michael Reesink purchased a six-unit apartment building (apartment building) on 38th Avenue, San Francisco, California, from their parents. Each acquired a 50% tenancy in common ownership interest in the building. And that concludes our record of civil behavior between the two brothers. At trial Mr. Reesink accused Michael Reesink of attacking and strangling him on several occasions as well as poisoning him by pouring cleaning fluid into his drinking water. Conversely, Michael Reesink stated at trial that Mr. Reesink has left him "holding the bag" on several occasions while Mr. Reesink went out to have a "real, good, fancy time". At some time after reviewing the financial statements for the apartment building, Mr. Reesink determined that Michael Reesink had been stealing money from him.

In late 2002 Mr. Reesink sued his brother Michael Reesink in State court for partition, breach of contract, breach of implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, and other causes of action with respect to their joint interests in the apartment building. On September 3, 2004, the brothers settled the case. Pursuant to the settlement agreement, the brothers agreed to sell

the apartment building and divide the net proceeds equally. Moreover, the agreement instructed Michael Reesink to pay $60,000 from his share of the net proceeds to Mr. Reesink.[6]

## II. The Sale of the Apartment Building

On September 23, 2005, the brothers sold the apartment building for $1.4 million. Each brother's pro rata share of the gross sale price was $700,000. Pursuant to the settlement agreement Michael Reesink paid Mr. Reesink $60,000 via the apartment building sale escrow account. Petitioners elected to pursue a section 1031 like-kind exchange[7] with respect to the proceeds--they paid the remaining debt and associated expenses of the sale, received $56,417 which they

---

[6]The settlement agreement stated "[Michael] shall pay to * * * [Patrick] the sum of $60,000 as payment in full for his claims arising from the events described in his complaint." While the purpose of the $60,000 payment is unclear because of the multitude of allegations in the complaint, the complaint does not ask for damages to compensate for physical injury or sickness. However, Michael testified at trial: "I paid $60,000 to my brother in the sale of the proceeds of the property because he and I had three physical, violent confrontations over different times."

[7]Petitioners were familiar with the concept of sec. 1031 like-kind exchanges before the sale of the apartment building. In 2003 petitioners sold investment real estate on Central Avenue, San Francisco, California, and used the proceeds to purchase investment real estate on Janet Lane, Guerneville, California (Janet Lane property). The Janet Lane property is a 1,063-square-foot single-family home built in 1960. It has two bedrooms and one bath, with a total lot size of 6,780 square feet. Petitioners borrowed $147,000 of the $379,000 purchase price.

characterized as taxable boot under section 1031(b) on their 2005 income tax return, and used the remaining $519,843 to purchase property on Laurel Lane in Guerneville, California (Laurel Lane property). Petitioners did not recognize the $429,296 gain from the sale of their interest in the apartment building as income on their 2005 income tax return.

## III. The Laurel Lane Property

After selling the apartment building petitioners began searching for real estate around Guerneville, California, and the Lake Tahoe area. On one trip to Lake Tahoe, petitioners met with a realtor from Agate Bay Realty who presented them with a few options. Petitioners eventually made an offer on one property, but the deal fell through. Thereafter, Dave Millar, a realtor who had worked with petitioners on their 2003 purchase of the Janet Lane property, suggested petitioners take a look at the Laurel Lane property--a 2,226-square-foot single-family home.

On November 4, 2005, petitioners purchased the Laurel Lane property for $649,900 as well as an undeveloped adjacent lot for $30,000.[8] They received a residential loan of $138,200 from Home Loans USA to help finance the purchase of

---

[8]The Laurel Lane property was built in 1980 and has three bedrooms, three bathrooms, and a total lot size of 13,939 square feet. The adjacent lot size is 3,094 square feet.

the Laurel Lane property, subject to a deed of trust. A box was checked on the loan application indicating that the Laurel Lane property was purchased for investment purposes. Petitioners paid $27,456 of settlement charges associated with the sale of the Laurel Lane property. The seller financed $27,000 of the adjacent lot's selling price.

Petitioners posted flyers throughout Guerneville advertising the Laurel Lane property for rent but did not advertise in the newspaper.[9] Mr. Reesink's other brother, Richard Reesink, changed light fixtures and installed security lighting at the Laurel Lane property. He saw "for rent" signs at the Laurel Lane property every time he was there, which he estimated to be at least 10 or 12 times.

On advice from Mr. Millar, petitioners attempted to rent the Laurel Lane property for $3,000 per month. On two different occasions, potential renters Tabatha Howell and Scott Wright visited the Laurel Lane property. However, both parties ultimately notified petitioners by letter that they had decided not to rent the Laurel Lane property because the monthly rent was out of their price range.

_____

[9]Petitioners used a similar advertising strategy to rent the Janet Lane property, which was renting for $1,200 to $1,400 per month. Petitioners reported gross rental income for the Janet Lane property of $15,400 for 2006, zero for 2005, $4,500 for 2004, and $1,830 for 2003.

Petitioners never lowered their monthly asking price, nor did they ever find tenants for the Laurel Lane property.

IV. Petitioners' Move to the Laurel Lane Property

At the beginning of 2006 petitioners owned the following properties: (1) their primary residence[10] on 48th Avenue, San Francisco, California (primary residence); (2) the Janet Lane property; and (3) the Laurel Lane property with adjacent lot. Petitioners were responsible for making mortgage payments associated with all of the properties, as well as payments on a home equity line of credit (HELOC) associated with their primary residence. Before the sale of their primary residence, petitioners' material liabilities consisted of: (1) primary residence--$78,294; (2) Janet Lane property--$145,597; (3) HELOC--$105,761; and (4) Laurel Lane property--$137,569. On the Laurel Lane mortgage application petitioners valued their primary residence at $800,000 and the Janet Lane property at $379,000. While petitioners purchased the Laurel Lane property and adjacent lot for $649,900 and $30,000, respectively, they believe the values of these properties had dropped significantly since their purchase. Finally, petitioners faced current or upcoming payments for their son's adoption, their children's tuition, child support, litigation

---

[10]Mr. Reesink acquired the primary residence around 1992. It was a Victorian style house, one block from the ocean, with a large yard and a view of the ocean.

expenses associated with the apartment building, real property expenses, and other standard living expenses.

After failing to rent the Laurel Lane property for several months, Mr. Reesink became concerned that they could no longer afford all three properties. Mrs. Reesink became very upset when Mr. Reesink proposed that they sell their primary residence[11]--she loved living in San Francisco, she did not want to transfer their adopted son to another school, and she thought about leaving Mr. Reesink if he insisted on moving.

On or around April 4, 2006, petitioners entered into a contract to list their primary residence for sale. Petitioners believed they had two options at the time they placed their primary residence for sale--either temporarily move in with Mr. Reesink's sister or live at the Laurel Lane property. They did not consider purchasing another property. On May 17, 2006, petitioners entered into a contract to sell their primary residence, and they closed the sale on June 30, 2006. The house sold for $810,000, with petitioners receiving $587,382 in net proceeds. Petitioners moved into the Laurel Lane property in June 2006 and continue to reside there today.

---

[11]Petitioners believed that the Laurel Lane property had dropped significantly in value in the wake of the housing crises and that their primary residence was the only property in which they had accumulated much equity.

## V. Other Matters

Michael McLaughlin, an enrolled agent, has prepared Mr. Reesink's tax return every year since 1990 as well as petitioners' joint income tax returns every year since their marriage. He first learned of the sale of the apartment building and purchase of the Laurel Lane property in 2006 upon receiving petitioners' 2005 tax information. Petitioners' eventual decision to move into the Laurel Lane property was never discussed with Mr. McLaughlin, nor was the $60,000 petitioners received from the settlement agreement with Michael Reesink.

Michael Reesink provided Mr. McLaughlin with the 2005 income and expense statements for the apartment building. The statements were handwritten and incomplete. Mr. McLaughlin mistakenly underreported petitioners' 2005 gross rental receipts by $16,392.[12] Petitioners also reported a $1,124 miscellaneous itemized deduction on Schedule A, Itemized Deductions, for 2005. That deduction was for expenses incurred while traveling to and from the Lake Tahoe region in search of real estate. Petitioners timely filed their 2005 joint Federal income tax

_____

[12]Petitioners reported $10,400 of rental gross receipts from the apartment building on their 2005 joint Federal income tax return. Actual 2005 gross rental receipts from the apartment building were $26,792. Moreover, petitioners' gross rental receipts from the apartment building were $41,538 for 2004, $38,430 for 2003, and $41,145 for 2002.

return, and on October 22, 2009, respondent issued to petitioners a notice of deficiency.

## OPINION

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer has the burden of proving it incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).[13]

### I. The Like-Kind Exchange

Section 1031(a) provides that no gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if the property is exchanged solely for property of a like kind that is to be held either for productive use in a trade or business or for investment.[14] One of the primary purposes for allowing the deferral of gain in a like-kind exchange is to avoid imposing a tax upon a taxpayer who, while changing his form of ownership, is continuing the nature of his investment. Wagensen v. Commissioner, 74 T.C. 653, 658 (1980). Under section 1031(d), the basis of property acquired in a section 1031

---

[13]Petitioners do not contend that sec. 7491(a) should apply to shift the burden of proof to respondent.

[14]In an otherwise qualifying like-kind exchange, a taxpayer's realized gain is recognized to the extent the consideration received includes unqualified property (boot). Sec. 1031(b); sec. 1.1031(a)-1(a)(2), Income Tax Regs.

exchange is the same as the basis of the property exchanged, decreased by any money that the taxpayer receives and increased by any gain that the taxpayer recognizes.

Section 1031 and the regulations thereunder allow for deferred exchanges of property. Under section 1031(a)(3) and section 1.1031(k)-1(b), Income Tax Regs., however, the property a taxpayer receives in the exchange (replacement property) must be: (1) identified within 45 days of the transfer of the property relinquished in the exchange (relinquished property), and (2) received by the earlier of 180 days after the transfer of the relinquished property or the due date (including extensions) of the transferor's tax return for the tax year in which the relinquished property is transferred. Respondent concedes that these timing requirements were met.

Respondent disputes only whether petitioners held the Laurel Lane property with investment intent at the time of the exchange. A taxpayer's intent to hold a property for productive use in a trade or business or for investment is a question of fact that must be determined at the time of the exchange. Bolker v. Commissioner, 81 T.C. 782, 804 (1983), aff'd, 760 F.2d 1039 (9th Cir. 1985); Click v. Commissioner, 78 T.C. 225, 231 (1982). Taxpayers bear the burden of proving that they had the requisite investment intent. Click v. Commissioner, 78 T.C. at 231;

Regals Realty Co. v. Commissioner, 43 B.T.A. 194, 208 (1940), aff'd, 127 F.2d 931 (2d Cir. 1942). We have held that investment intent must be the taxpayer's primary motivation for holding the exchanged property in order for the property to qualify as held for investment for purposes of section 1031. Moore v. Commissioner, T.C. Memo. 2007-134. The use of property solely as a personal residence is antithetical to its being held for investment. Starker v. United States, 602 F.2d 1341, 1350-1351 (9th Cir. 1979).

Respondent cites Goolsby v. Commissioner, T.C. Memo. 2010-64, to support his allegation that petitioners did not hold the Laurel Lane property with investment intent. In Goolsby, the taxpayers made the purchase of the replacement property contingent on the sale of their former personal residence and sought advice regarding whether they could move into the replacement property if renters could not be found. The taxpayers' only rental efforts consisted of placing a single advertisement in a neighborhood newspaper. Within two weeks of purchasing the property, the taxpayers began preparations to refinish the basement. The taxpayers subsequently moved into the replacement property within two months of acquiring it. On the basis of the above events, we found the taxpayers did not hold the replacement property with investment intent at the time of the exchange.

In Moore, we found the taxpayers' sale of one vacation property followed by the purchase of another vacation property did not qualify as a section 1031 like-kind exchange because at the time of the exchange the taxpayers' primary motivation for holding the properties was not for investment. The taxpayers used both vacation properties exclusively for recreational purposes--they never attempted to rent either property. We held that the mere expectation that the properties would increase in value is not enough to show the properties were held primarily with investment intent.

Unlike the taxpayers in Goolsby, who placed a single advertisement in a newspaper and then moved into the replacement property two months later, petitioners placed fliers throughout Guerneville, showed the Laurel Lane property to potential renters, and waited almost eight months before moving in. More importantly, the taxpayers in Goolsby made the purchase of the replacement property contingent on the sale of their personal residence. Petitioners, on the other hand, decided to sell their personal residence almost six months after purchasing the Laurel Lane property. Furthermore, unlike the taxpayers in Moore, petitioners made attempts to rent the Laurel Lane property and refrained from using it for recreational purposes before moving in.

Respondent argues that petitioners' actions surrounding the purchase of the Laurel Lane property were so unreasonable that they could not have intended to hold the Laurel Lane property for investment purposes and that they really purchased the Laurel Lane property to use as their residence. Respondent supports his argument by emphasizing that petitioners had a "healthy balance sheet" and by pointing to all of the actions they could have taken.[15] In 2005 petitioners' decision to purchase the Laurel Lane property may not have been financially sound, but it was not unreasonable for them to believe they could supplement their diminishing wages with rental proceeds.

Moreover, we do not determine petitioners' intent on the basis of their financial position because we find the trial testimony of Mrs. Reesink, Richard

---

[15]While petitioners' financial position has not been fully established by the parties, respondent's analysis of their "healthy balance sheet" is misguided. Respondent places improper emphasis on comparing petitioners' total assets to total liabilities, while ignoring their potential liquidity problems. Petitioners were unable to rent the replacement property, and Mr. Reesink's wages had drastically decreased because of his disability. On the other hand, petitioners had a multitude of current liabilities, including their children's tuition, child support, adoption expenses, three mortgage payments, a home equity line of credit, and other real property expenses. Most of petitioners' assets were invested in real property, and they chose to sell their personal residence to alleviate their liquidity problems. It is unclear whether petitioners spent or retained any proceeds from the litigation settlement or the taxable boot at the time they decided to sell their personal residence; but even if they had retained the money, they were still not in the healthy financial position that respondent envisions.

Reesink, and Scott Wright to be credible. Mrs. Reesink testified that she never discussed moving to Guerneville until after the exchange had been completed, and petitioners believed they were in a financial predicament. Richard Reesink testified that petitioners were having a hard time renting the Laurel Lane property and that he was surprised they sold their primary residence. Finally, Scott Wright testified that he visited the Laurel Lane property with the intention of renting it.

Perhaps the strongest indicator of petitioners' intent at the time of the exchange comes from respondent's witness--Michael Reesink. He testified that Mr. Reesink had told him on several occasions that petitioners planned to sell their personal residence and move to Guerneville once their children were out of high school. Mr. Reesink's oldest son was born in March 1991, the apartment building was sold September 23, 2005, and the Laurel Lane property was purchased November 4, 2005. Therefore, at all times during the exchange process petitioners' eldest son was only 14 years old. Moreover, he was only 15 years old when petitioners moved into the Laurel lane property-- he was still in high school throughout all of the events surrounding the like-kind exchange. Michael Reesink's testimony supports the proposition that at the time of the exchange, petitioners held the Laurel Lane property with investment intent.

On the basis of the foregoing discussion, we hold that petitioners held the Laurel Lane property with investment intent at the time of the exchange. Therefore, petitioners' sale of the apartment building followed by their purchase of the Laurel Lane property qualifies as a section 1031 like-kind exchange, and they are not required to recognize gain on the sale of the apartment building for 2005.

II. Proceeds From Litigation Settlement

Section 61(a) includes in gross income "all income from whatever source derived" unless excluded by a specific provision of the Code. This statute is construed broadly, whereas exclusions from gross income are construed narrowly. Commissioner v. Schleier, 515 U.S. 323, 328 (1995); United States v. Burke, 504 U.S. 229, 233 (1992); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). Section 104(a)(2) excludes from gross income "the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness".[16]

---

[16]The Small Business Job Protection Act of 1996 (SBJPA), Pub. L. No. 104-188, sec. 1605, 110 Stat. at 1838, amended sec. 104(a)(2) to narrow the exclusion for damages received for personal injuries or sickness to damages for personal injury or sickness that is physical, effective for amounts received after August 20, 1996. See United States v. Burke, 504 U.S. 229, 236 n.6 (1992) (preamendment personal injuries or sickness did not include damages pursuant to

(continued...)

To be eligible for the section 104(a)(2) exclusion, a taxpayer must demonstrate that (1) the underlying cause of action giving rise to the recovery is based in tort or tort-type rights, and (2) the damages were received on account of personal physical injuries or physical sickness. Commissioner v. Schleier, 515 U.S. at 337; Prasil v. Commissioner, T.C. Memo. 2003-100. In the context of section 104(a)(2), the terms "physical injury" and "physical sickness" do not include emotional distress, except to the extent of damages not in excess of the amount paid for medical care described in section 213(d)(1)(A) and (B) attributable to emotional distress. See sec. 104(a).

When damages are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement, and not the validity of the claim, controls whether the amount is excludable under section 104(a)(2). United States v. Burke, 504 U.S. at 237; see also Bagley v. Commissioner, 105 T.C. 396, 406 (1995) ("[T]he critical question is, in lieu of what was the settlement amount paid?"), aff'd, 121 F.3d 393 (8th Cir. 1997). The determination of the nature of

---

[16](...continued)
the settlement of purely economic rights but did include "nonphysical injuries to the individual, such as those affecting emotions, reputation, or character"). SBJPA also amended sec. 104(a)(2) to except punitive damages from the exclusion irrespective of whether they derived from a case involving physical or nonphysical injury.

the claim is a factual inquiry and is generally made by reference to the settlement agreement in the light of the surrounding circumstances. Robinson v. Commissioner, 102 T.C. 116, 126 (1994), aff'd in part, rev'd in part on another issue, 70 F.3d 34 (5th Cir. 1995). An express allocation in the settlement agreement of a portion of the proceeds to tort or tortlike claims is generally binding for tax purposes if the agreement was entered into by the parties in an adversarial relationship at arm's length and in good faith. Bagley v. Commissioner, 105 T.C. at 406-407; Robinson v. Commissioner, 102 T.C. at 126-127. If the settlement agreement lacks express language stating what the settlement amount was paid to settle, we look to the intent of the payor, based on all the facts and circumstances of the case, including the complaint that was filed and the details surrounding the litigation. Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), aff'g T.C. Memo. 1964-33; Robinson v. Commissioner, 102 T.C. at 127.

At the beginning of trial petitioners conceded that they should have reported the $60,000 of settlement proceeds received from Michael Reesink on their 2005 joint Federal income tax return. However, petitioners now wish to contest the issue after Michael Reesink testified that "I paid $60,000 to * * * [Mr. Reesink] * * * because * * * [Mr. Reesink] and I had three physical, violent confrontations over

different times." The settlement agreement provided that Michael Reesink should pay Mr. Reesink "$60,000 as payment in full <u>for his claims arising from the events described in his complaint</u>." (Emphasis added.) Mr. Reesink did not describe any events rising to the level of physical injuries or physical sickness in his complaint, nor did the complaint ask for damages for physical injuries or physical sickness. Moreover, Michael Reesink's testimony could just as easily have been referring to emotional distress (damages for which would be taxable income) as it could have been for physical injury. Petitioners bear the burden of proof, and there is insufficient evidence to lead us to conclude that Mr. Reesink was compensated for physical injuries or physical sickness. Without more, we find that the $60,000 payment from Michael Reesink to Mr. Reesink was taxable income to petitioners.

III. <u>Section 6662(a) Accuracy-Related Penalty</u>

Respondent determined that petitioners are liable for a section 6662(a) and (b)(1) accuracy-related penalty for an underpayment resulting from their negligence in failing to substantiate travel expenses, failing to report $60,000 of settlement proceeds as taxable income, and failing to report $16,392 of rental gross receipts.

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause or substantial authority under section 6664. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447. We find respondent has met the burden of production for the settlement proceeds, travel expenses, and rental receipts.

Section 6662(c) defines negligence as including any failure to make a reasonable attempt to comply with the provisions of the Code. Section 6662(c) also defines "disregard" as any careless, reckless, or intentional disregard. Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a tax return position that is contrary to rules or regulations. Sec. 1.6662-3(b)(2), Income Tax Regs. Disregard of rules or regulations is reckless if the taxpayer makes little or no effort to determine whether a rule or regulation exists. Id. Disregard of rules or regulations is intentional if the taxpayer has knowledge of the rule or regulation that he disregards. Id.

An underpayment is not attributable to negligence or disregard to the extent that the taxpayer shows that the underpayment is due to the taxpayer's having reasonable cause and acting in good faith. Sec. 6664(c)(1); Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d. 221 (3d Cir. 2002). Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item. See United States v. Boyle, 469 U.S. 241 (1985); Estate of Young v. Commissioner, 110 T.C. 297, 317 (1998). Good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. See United States v. Boyle, 469 U.S. at 241; sec. 1.6664-4(b), Income Tax Regs. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

For a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662 accuracy-related penalty determined by the Commissioner, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer

actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

A. Substantiation of Travel Expenses

Petitioners concede that they are unable to substantiate $1,124 of travel expenses incurred in searching for replacement property for the section 1031 like-kind exchange. While petitioners testified that: (1) the expenditures were actually incurred, and (2) they provided a summary worksheet of the expenses to their tax preparer, no summary worksheet was produced. Petitioners have failed to show reasonable cause for failure to substantiate their travel expenses. Therefore, we hold that petitioners are liable for the section 6662(a) accuracy-related penalty on the portion of the underpayment associated with the travel expenses deducted on their joint 2005 Federal income tax return.

B. Settlement Proceeds

Petitioners argue that they provided Mr. McLaughlin with the closing statement from the sale of the apartment building, and the closing statement listed "Settlement from Michael Reesink to Patrick Reesink--$60,000" separately from the sale proceeds. While Mr. McLaughlin was aware that petitioners received $56,417 of taxable boot in the like-kind exchange, Mr. McLaughlin testified that he was not told about the $60,000 of settlement proceeds. Petitioners argue that Mr.

McLaughlin confused the two numbers and therefore failed to report the settlement proceeds.

Even if petitioners informed Mr. McLaughlin about the settlement proceeds, we still find petitioners liable for the section 6662(a) accuracy-related penalty. Both the settlement proceeds and the boot received in the like-kind exchange were taxable. Even a cursory review of petitioners' 2005 tax return would have revealed that the $60,000 of settlement proceeds was not reported. There is no evidence that petitioners ever inquired with a professional or anyone else about the taxability of the settlement payment. Therefore, we hold petitioners have failed to show reasonable cause and are liable for the section 6662(a) accuracy-related penalty on the portion of the underpayment associated with the settlement proceeds.

C. Underreported Rental Gross Receipts

Petitioners also concede that they failed to report $16,392 of rental gross receipts. Michael Reesink was in charge of keeping the accounting records for the apartment building. He provided Mr. McLaughlin with handwritten income and expense statements for the apartment building for the 2005 tax year. While these statements were sloppily constructed, petitioners should have noticed that rental gross receipts had substantially declined in 2005 from what was reported on their

2002, 2003, and 2004 joint Federal income tax returns. While the sale of the apartment building during 2005 may have accounted for some of this discrepancy, petitioners were well aware that Michael Reesink's bookkeeping could not be trusted. Petitioners failed to make even basic inquiries into the substantial decrease in rental gross receipts. Therefore, petitioners have failed to show reasonable cause and are liable for the section 6662(a) accuracy-related penalty on the portion of the underpayment associated with their failure to report $16,392 of rental gross receipts.

IV. Conclusion

We conclude that petitioners' sale of the apartment building followed by the purchase of the Laurel Lane property qualifies as a section 1031 like-kind exchange. Moreover, we conclude that the $60,000 of settlement proceeds should have been reported as taxable income on petitioners' 2005 joint Federal income tax return. Finally, we conclude that petitioners are liable for the section 6662(a) accuracy-related penalty associated with the portions of the underpayment relating to the settlement proceeds, the rental income, and the travel expenses. In reaching our holding herein, we have considered all arguments made by the parties, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.