T.C. Memo. 2013-28

UNITED STATES TAX COURT

JESSIE G. YATES III AND MELISSA LONG YATES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3685-11.                    Filed January 24, 2013.

Jessie G. Yates III and Melissa Long Yates, pro sese.

<u>Olivia H. Rembach</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined a $123,648 deficiency and a

$24,729.60 accuracy-related penalty under section 6662(a)[1] for petitioners' taxable

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue
Code (Code) in effect for the year in issue.  All Rule references are to the Tax Court
Rules of Practice and Procedure.

[*2] year 2006. Following concessions, the remaining issues for decision relate to petitioners' section 1031 like-kind exchange. In particular, we must determine:

(1) whether petitioners held real property at 831 Memorial Drive, Warsaw, North Carolina (Memorial Drive property), either for productive use in a trade or business or for investment at the time of the section 1031 exchange. We hold that petitioners did not hold the Memorial Drive property for either purpose;

(2) whether petitioners properly allocated fair market values to certain real properties for purposes of determining gain recognized in the section 1031 exchange. We hold that respondent has failed to satisfy his burden of proof on this issue; and,

(3) whether petitioners are liable for an accuracy-related penalty under section 6662(a). Subject to a Rule 155 computation, we hold that petitioners are so liable.

## FINDINGS OF FACT

Petitioners resided in North Carolina at the time the petition was filed.

## I. Properties at Issue

In 1992 petitioners purchased an empty lot at 8212 Lakeview Drive, Wilmington, North Carolina (Lakeview property), for $27,000. Thereafter, petitioners constructed a residential home on the property. The property was next

[*3] to a golf course and near a beach. While it is unclear from the record, petitioners apparently used the home as their primary residence for an indeterminate time, as well as for business purposes in the period leading to the exchange at issue in 2006. In January 2006 petitioners entered into an exclusive right to sell agreement for the Lakeview property with a local realtor. The listing price in the agreement was $419,000. Petitioners adduced no evidence at trial indicating that there were bids on the property at that price. The agreement terminated on July 13, 2006.

Petitioners also purchased oceanfront real estate at 100 Harper Avenue, Carolina Beach, North Carolina (Harper Avenue property), in 2003 for $403,000. Thereafter Mr. Yates, through his wholly owned corporation, Quality Pharm Group, Inc. (Quality Pharm Group), operated a restaurant on the property which he named the Hula Grill. On February 8, 2005, petitioners entered into an exclusive right to sell agreement for the Harper Avenue property with a local realtor. The listing price was set at $2,499,000. No evidence was submitted indicating that there were bids on the property at that price. The agreement terminated on August 4, 2005.

Petitioners also had the Harper Avenue property appraised during this period. The appraiser estimated that the fair market value of the property as of

[*4] March 15, 2005, was $1.8 million.[2] Mr. Yates indicated at trial that at unspecified dates he received two separate bids of $1.5 million for the Harper Avenue property; however, one bid called for the deferral of payment, and Mr. Yates was leery of the creditworthiness of the second bidder. Given Mr. Yates' aversion to investment risk, he rejected both bids.

For comparative purposes, a 2003 appraisal of 201 Harper Avenue, a nearby, similarly zoned property, performed by a different appraiser, was entered into evidence at trial.[3] The appraisal report listed that property's estimated market value as of December 3, 2003, at $656,000.

---

[2]The appraisal report indicates that the real estate market in the relevant area for the 24 months preceding the appraisal had been experiencing rapid growth. As a result, the appraiser, in comparing the Harper Avenue property to other properties sold in the area, adopted a 7% per month upward adjustment. However, the appraiser presciently admonished: "Obviously, these exorbitant rates cannot be indefinitely sustained."

The appraisal report also notes that the Harper Avenue property is 3,111 square feet (0.076 acres). The restaurant facility on the property was identified as an approximately 7,307-square-foot wood-framed building. The property had been previously appraised for ad valorem tax purposes as of January 1, 1999, at $396,884. Of that amount, $329,360 was attributed to the facility on the property and $67,524 was attributed to the land.

[3]The owner of 201 Harper Avenue had purchased the property in June 2002 for $488,500. The parcel was approximately 3,500 square feet and was appraised under the assumption that it would be "renovated into a combination residential/office unit, 6,000 square feet of residential and 900 square feet of office space."

**[\*5]**   On February 2, 2006, petitioners entered into another exclusive right to sell agreement with a separate realtor for the Harper Avenue property.  The listing price set in that agreement was $3.1 million.  Again, petitioners adduced no evidence demonstrating that any bids were submitted on the property at that price,  and the agreement terminated on August 2, 2006.

## II.  Like-Kind Exchange

By 2006 the Harper Avenue property had purportedly become a desirable parcel of land.  In particular, a local businessman, Russell Maynard, had individually or through his company, Seaview Properties, LLC, purchased all contiguous property.  Mr. Maynard ultimately intended to construct a Hilton hotel at the location and needed the Harper Avenue property to complete the project.  Fortunately for Mr. Maynard, he owned a parcel of land adjacent to the Hula Grill which the Hula Grill had leased to serve as its parking lot.  In an effort to induce petitioners to sell the Harper Avenue property, Mr. Maynard terminated the parking lot lease.  Petitioners understood that without a viable parking lot their business would suffer, perhaps irreparably.

Petitioners, frustrated by Mr. Maynard's efforts, begrudgingly began negotiations for the sale of the Harper Avenue property.  During the negotiations petitioners indicated that they would sell the Harper Avenue property only if Mr.

[**\*6**] Maynard also purchased either the Lakeview property or their residence at South Churchill Drive, Wilmington, North Carolina. While originally reluctant to purchase either, Mr. Maynard recognized that petitioners were steadfast in conditioning the sale of the Harper Avenue property on the corresponding sale of one of the other offered properties. Eventually, Mr. Maynard agreed to purchase the Lakeview property. At that point, petitioners intended the sale of the Harper Avenue property and the Lakeview property to be pieces of a larger like-kind exchange pursuant to section 1031.[4]

The sale of the properties between petitioners and Seaview Properties, LLC, was consummated in March 2006. The governing purchase agreement, in an attached exhibit, provided:

---

[4]The property exchanges at issue were not immediately contemporaneous; however, pursuant to the regulations issued under sec. 1031, a "qualified intermediary" with which the taxpayer has entered into an "exchange agreement", may be used to facilitate a nonsimultaneous exchange of property. See sec. 1.1031(k)-1(g)(4), Income Tax Regs. While the circumstances of the exchanges are vague, we infer that respondent's failure to raise an issue pertaining to the procedure of the exchange indicates that petitioners appropriately used a qualified intermediary in structuring the transfer of the properties.

[*7]  [Petitioners] will allocate the purchase price as follows:

| | |
|---|---|
| Hula Grill purchase price: | $895,000 |
| Quality Pharm Group (to cease doing business at this said location 100 Harper Avenue by September 15, 2006, purchase price of lease agreement [sic]: | 505,000 |
| 8212 Lakeview property | 750,000 |
| Total Purchase Price | 2,150,000 |

Mr. Maynard signed the purchase agreement twice:  on March 16, 2006, and again on March 25, 2006.

A separate settlement statement for the U.S. Department of Housing and Urban Development (HUD statement) also listed the contract sale price as $2,150,000, with $505,000 due to "Quality Pharm Group".  Mr. Maynard's signature is readily apparent on this document.

Following his purchase of the Lakeview property, Mr. Maynard spent approximately $10,000 to $15,000 repairing it to make it suitable for resale.  In November 2006 Mr. Maynard sold the Lakeview property for $310,000.

In February 2005 petitioners entered into an offer to purchase and contract for the sale of the Memorial Drive property.  The contract indicated that "The buyer is doing a 1031 exchange.  The buyer requests the seller apply to town for

[*8] approval as [sic] use as bed and breakfast at buyer expense." Petitioners

submitted no evidence indicating whether the seller of the Memorial Drive property

ever made such an application to the appropriate municipal body.

On May 12, 2006, petitioners closed on the purchase of the Memorial Drive

property for $325,000. Three days later, on May 15, 2006, petitioners closed on the

sale of their then residence at South Churchill Drive, Wilmington. Petitioners

thereafter moved into the Memorial Drive property on May 16, 2006. Mr. Yates

still resided at the Memorial Drive property as of May 15, 2012.[5]

III. Return Position

Petitioners filed a joint return for taxable year 2006. In reporting the like-

kind exchange on their return, they adopted the fair market values of the properties

reflected in the governing purchase agreement. The exchange was summarized on

petitioners' Form 8824, Like-Kind Exchanges (and section 1043 conflict-of-interest

sales), as follows:

---

[5]Petitioners received two other properties as part of their like-kind exchange: (1) 5111 Carolina Beach Road, Wilmington, North Carolina; and (2) 5602 Fairfield Fairy Road, Stantonsburg, North Carolina.

**[*9]** 15. Cash received, FMV of other property received, plus net liabilities assumed by other party, reduced (but not below zero) by any exchange expenses you incurred.     $1,080,060

16. FMV of like-kind property you received.     990,428

17. Add lines 15 and 16.     2,070,488

18. Adjusted basis of like-kind property you gave up, net amounts paid to other party, plus any exchange expenses not used on line 15.     576,036

19. Realized gain or (loss). Subtract line 18 from line 17.[1]     1,101,307

20. Enter the smaller of line 15 or line 19, but not less than zero.     686,915

21. Ordinary income under recapture rules.     - 0 -

22. Subtract line 21 from line 20.     686,915

23. Recognized gain. Add lines 21 and 22.     686,915

24. Deferred gain or (loss). Subtract line 23 from line 19.     414,392

25. Basis of like-kind property received. Subtract line 15 from the sums of lines 18 and 23.     576,036

[1]Petitioners made a notation on line 19 reporting a $393,145 sec. 121 exclusion from income.

## IV. Notice of Deficiency

Respondent's position reflected in the notice of deficiency is that petitioners artificially inflated the fair market value of the Hula Grill while simultaneously deflating the fair market value of the Lakeview property to avoid recognition of income (discussed further infra). Accordingly, respondent adjusted the values of petitioners' exchanged properties as follows:

| [*10] | Hula Grill purchase price | $1,295,000 |
| | Quality Pharm Group | 505,000 |
| | 8212 Lakeview property | 350,000 |
| | Total purchase price | 2,150,000 |

OPINION

I. Legal Background

The issues for decision in this case emanate from petitioners' like-kind exchange. The general rule regarding recognition of gain or loss on the sale or exchange of property is that the entire amount of the gain or loss is recognized. Sec. 1001(c). An exception to this rule prescribed in section 1031 is that no gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if the property is exchanged solely for property of a like kind that is to be held either for productive use in a trade or business or for investment. Sec. 1031(a). If, however, money or unqualified property is received in an otherwise qualifying like-kind exchange, a taxpayer's realized gain is recognized to the extent of the sum of such money and the fair

[*11] market value of such unqualified property (boot).  Sec. 1031(b); sec.

1.1031(a)-1(a)(2), Income Tax Regs.[6]

A typical like-kind exchange requires a "property-by-property" comparison

for computing gain recognized in the transaction.  Sec. 1.1031(j)-1(a)(1), Income

Tax Regs.  However, if multiple properties are transferred in a like-kind exchange,

the properties are separated and arranged for analysis into "exchange groups"

based on shared characteristics.  Sec. 1.1031(j)-1(b)(2)(i), Income Tax Regs.[7]

Money and boot are placed in a separate "residual group".  Sec. 1.1031(j)-

1(b)(2)(iii), Income Tax Regs.[8]  A main contention of respondent is that the

Memorial Drive property should be characterized as boot, resulting in a

---

[6]In determining the amount realized from the like-kind exchange at issue, petitioners appear to have merely aggregated the fair market values of all properties and cash received, $2,070,488.  They then subtracted from that amount the aggregate bases of properties transferred, $576,036, to compute the tentative gain recognized, $1,494,452.  Petitioners aver that sec. 121 entitles them to exclude $393,145 of that amount from income.

[7]"Each exchange group must consist of at least one property transferred and at least one property received in the exchange."  Sec. 1.1031(j)-1(b)(2)(i), Income Tax Regs.

[8]Generally, a "residual group" is created if the aggregate fair market value of the properties transferred in all of the exchange groups differs from the aggregate fair market value of the properties received in all the exchange groups.    Sec. 1.1031(j)-1(b)(2)(iii), Income Tax Regs.

[*12] reallocation of the properties in the relevant exchange and residual groups. This would affect petitioners' gain recognized on the exchange, discussed further infra.

Taxpayers must also net any liabilities assumed as part of the exchange with any liabilities relieved as part of the exchange. Sec. 1.1031(j)-1(a)(2), Income Tax Regs. If, as in this case, the amount of liabilities for which the taxpayer is relieved in the exchange exceeds the amount of liabilities he assumes, the excess is allocated to the "residual group" as well. Sec. 1.1031(j)-1(b)(2)(ii)(C), Income Tax Regs.

Thereafter, the fair market values of the properties received and the properties exchanged in each exchange group are compared. Sec. 1.1031(j)-1(b)(2)(iv), Income Tax Regs. If the aggregate fair market value of the properties received in an exchange group exceeds the aggregate fair market value of the properties transferred in the same exchange group, the excess is considered an "exchange group surplus". Id. Conversely, if the aggregate fair market value of the properties transferred in an exchange groups exceeds the aggregate fair market

**[*13]** value of the properties received in the same exchange group, the excess is

considered an "exchange group deficiency". Id.[9]

A taxpayer's amount of gain or loss realized with respect to each exchange

group and the residual group is the difference between the aggregate fair market

value of the properties transferred in that exchange or residual group and the

properties' aggregate adjusted basis. Sec. 1.1031(j)-1(b)(3)(i), Income Tax Regs.

Any gain realized for each exchange group is recognized to the extent of the lesser

of the gain realized and the amount of the "exchange group deficiency", if any. Id.

Regarding the residual group, the recognized gain or loss determined under the

general rules is prescribed by section 1001. Id.

A separate provision, section 121, excludes from income gain realized and

recognized in certain property transfers. In particular, for taxpayers filing joint

returns, section 121 excludes from gross income up to $500,000 of gain from the

sale or exchange of property if, during the 5-year period preceding such transfer,

---

[9]If the taxpayer assumed liabilities in excess of liabilities exchanged in the transaction, any "exchange group surplus" or "exchange group deficiency" is adjusted accordingly. Sec. 1.1031(j)-1(b)(2)(iv), Income Tax Regs. As noted supra, petitioners were relieved of liabilities in the exchange in excess of liabilities assumed.

**[*14]** at least one spouse owned the property and both spouses used the property as their principal residence for the aggregate of two or more years. Sec. 121(a), (b)(2).[10]

Respondent concedes that the Lakeview property qualifies as petitioners' personal residence for purposes of section 121. Consequently, we are presented with the simultaneous application of section 121 and section 1031 to the exchange at issue. The Commissioner has indicated that in these circumstances "[s]ection 121 must be applied to gain realized before applying section 1031." Rev. Proc. 2005-14, sec. 4.02, 2005-1 C.B. 528, 529. Accordingly, any realized gain attributable to the exchange of the Lakeview property as a distinct, discrete part of petitioners' overall like-kind exchange is excluded pursuant to section 121.

Respondent proffers that petitioners manipulated this statutory scheme by artificially deflating and inflating the fair market values of the Lakeview property and the Harper Avenue property, respectfully, in a purportedly misguided attempt to exclude recognized gain from income. Therefore, our inquiry regarding respondent's assertion narrows to whether petitioners' allocation of fair market

---

[10]To be entitled to the entire $500,000 exclusion, neither jointly filing spouse may have applied sec. 121 to exclude gain on property sold or exchanged within the two years preceding the sale or exchange of the property at issue. Sec. 121(b)(2)(A)(iii), (3).

**[\*15]** values to the exchanged properties comports with the economic reality of the transaction or simply represents petitioners' specious attempt to limit their tax exposure.

## II. Burden of Proof

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Nonetheless, if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining his Federal income tax liability, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. Sec. 7491(a)(1). "Credible evidence" is evidence that, after critical analysis, would constitute a sufficient basis for deciding the issue in favor of the taxpayer if no contrary evidence were submitted. Ocmulgee Fields, Inc. v. Commissioner, 132 T.C. 105, 114 (2009), aff'd, 613 F.3d 1360 (11th Cir. 2010).

The shifting of the burden of proof, however, is conditioned upon the taxpayer's first demonstrating that he or she met the requirements of section 7491(a)(2), including: (1) substantiating any item as required by the Code; (2) maintaining all records required by the Code; and (3) cooperating with the Commissioner's reasonable requests for witnesses, information, documents,

**[*16]** meetings, and interviews. While respondent does not concede that petitioners have satisfied the requirements of section 7491(a)(2), at trial petitioners convincingly testified regarding their substantial efforts to accommodate respondent during audit. This testimony was uncontested. Indeed, there appears to be no dispute that petitioners maintained all required documentation and allowed respondent full access to all available records. Accordingly, we find that petitioners have satisfied the preliminary requirements set forth in section 7491(a)(2).

We now turn to whether petitioners have adduced credible evidence regarding the two immediate issues for which the burden of proof may be shifted pursuant to section 7491: (1) whether petitioners held the Memorial Drive property either for productive use in a trade or business or for investment at the time of the section 1031 exchange; and (2) whether petitioners properly allocated fair market values to the exchanged properties in the purchase agreement.

A. <u>Memorial Drive Property--Business or Investment Intent</u>

Petitioners rely principally on their testimony at trial as evidencing their intent to use the Memorial Drive property as a "bed and breakfast" at the time of the like-kind exchange. However, self-serving testimony without corresponding objective evidence is of negligible probative value and fails to meaningfully

**[*17]** inform the Court as to any disputed issues. Accordingly, such testimony is routinely rejected. See Shea v. Commissioner, 112 T.C. 183, 189 (1999); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Crispin v. Commissioner, T.C. Memo. 2012-70, 2012 Tax Ct. Memo LEXIS 70, at *21. Notwithstanding petitioners' largely uncorroborated testimony, they do refer the Court to a provision in the Memorial Drive property sale contract where they "request[ed]" that the seller apply to the appropriate town board to use the Memorial Drive property "as bed and breakfast at buyer expense". Nonetheless, petitioners provided no evidence demonstrating that such a request was ever made or that they even inquired as to whether the seller's fulfilled this nonobligatory term of the contract. Furthermore, the sale was not explicitly conditioned upon the seller's successfully securing municipal consent to use the Memorial Drive property as a bed and breakfast; instead, the provision served as nothing more than a trivial addition inserted in the contract for the purpose of securing petitioners' desired nonrecognition treatment of the exchange. Without the benefit of further objective evidence establishing petitioners' legitimate efforts to hold the Memorial Drive property as a business or investment property, we cannot find that they have adduced credible evidence warranting a shifting of the burden of proof pursuant to section 7491.

[*18] B.  Allocation of Fair Market Values

Petitioners effectively submit that the purchase agreement represents a duly bargained agreement between adverse parties and that the allocations therein represent credible evidence sufficient to shift the burden of proof to respondent.  To be sure, this Court strictly scrutinizes an allocation if it does not have adverse tax consequences for the parties; adverse tax interests deter allocations which lack economic reality.  Bemidji Distrib. Co. v. Commissioner, T.C. Memo. 2001-260 (citing Wilkof v. Commissioner, 636 F.2d 1139 (6th Cir. 1981), aff'g per curiam T.C. Memo. 1978-496), aff'd sub nom. Langdon v. Commissioner, 59 Fed. Appx. 168 (8th Cir. 2003).  Petitioners, however, correctly note that the purchaser, Mr. Maynard, is an adverse party in the transaction.[11]  Any tax benefit to one party in

---

[11]Respondent avers that the alleged qualification inserted in the purchase agreement that the "Seller will allocate the purchase price" (emphasis added) represents that there was no mutual agreement between the parties regarding the allocations and that Mr. Maynard was free to deviate from the allocations "for taxes or other purposes".  We are skeptical that respondent would maintain this position if the allocations inured to the benefit of Mr. Maynard.

Further, to accord any persuasive weight to respondent's argument we would have to accept that inserting the allocations into the document was a superfluous exercise, similar to the provision in the Memorial Drive property contract, having no affect on the parties.  We do not interpret the purchase agreement in the manner respondent suggests; rather, we find that the unambiguous language of the purchase agreement engendered mutual obligations on the parties to report the sale prices in

(continued...)

[*19] the exchange was counterpoised by a tax detriment to the other. This is highlighted by the fact that Mr. Maynard apparently treated the transaction, from his viewpoint, as a section 1001 transaction. The allocations, therefore, were critical in ascertaining Mr. Maynard's cost basis in the properties he received in the exchange. See sec. 1012(a) ("The basis of property shall be the cost of such property[.]"). Therefore, the tax consequences of any subsequent sale of the properties Mr. Maynard received in the exchange would be affected by the allocations. See sec. 1001.

Petitioners also assert that the price allocations in the purchase agreement, when compared on a dollar-per-acre basis with those of the nearby properties, exhibit competitive prices for real estate in the respective areas. To demonstrate this point, petitioners submitted to the Court copies of various real estate deeds, some reflecting purchase prices, for properties in the same localities as those at

---

[11](...continued)
accord with the specifically delineated allocations in the document. See, e.g., Elrod v. Commissioner, 87 T.C. 1046, 1065-1066 (1986) (taxpayers attempting to challenge a contractual allocation must adduce "strong proof", meaning more than a preponderance of the evidence, that the terms of the written instrument do not reflect the actual intentions of the contracting parties). Mr. Maynard's initialing of the purchase agreement page at issue underscores that he, at least at one point, recognized the economic consequence of the allocations.

**[\*20]** issue. While petitioners' pricing methodology is both unorthodox and unscientific, it at minimum slightly bolsters the credibility of their argument.[12]

When the evidence is viewed in toto, we find that petitioners have submitted credible evidence concerning the validity of the contractual sale price allocation sufficient to shift the burden of proof pursuant to section 7491(a)(1). The burden of proof rests with respondent on this issue.

III. Business or Investment Intent

Whether a taxpayer intends to hold a property for productive use in a trade or business or for investment is a question of fact that must be determined at the time of the exchange. Bolker v. Commissioner, 81 T.C. 782, 804 (1983), aff'd, 760 F.2d 1039 (9th Cir. 1985); Click v. Commissioner, 78 T.C. 225, 231 (1982). The use of property solely as a personal residence is antithetical to its being held for investment or business purposes. See, e.g., Starker v. United States, 602 F.2d 1341, 1350-1351 (9th Cir. 1979).

The record is devoid of objective evidence tending to shed light on the circumstances surrounding petitioners' acquisition of the Memorial Drive

---

[12]Petitioners' inartful attempt to compare relevant sale prices suffers, among other reasons, from their inability to carefully delineate the proximity of the properties reflected in the deeds with the exchanged properties. The vague record limits the persuasiveness of petitioners' argument.

**[*21]** property.  As noted supra, petitioners rely primarily on their testimony and the

provision inserted in the relevant sales contract requesting that the seller apply for

permission to use the property as a "bed and breakfast" to demonstrate their

business intent.  It is undisputed, however, that petitioners moved into the Memorial

Drive property a mere four days after the close of the sale and treated the home as

their primary residence for an indeterminate time.[13]  In the light of two recent cases

of this Court, we remain unconvinced that these facts effectively establish that

petitioners intended to hold the property for business purposes at the time of the

exchange.

In Goolsby v. Commissioner, T.C. Memo. 2010-64, 2010 Tax Ct. Memo

LEXIS 64, taxpayers entered into a like-kind exchange for the ostensible purpose

of using the real estate received in the transaction as a rental property.  Citing,

among other factors, the taxpayers' failure to research whether certain covenants

permitted the use of the real estate as rental property, their minimal efforts to

actually rent the property, and the fact that they moved into the property within

---

[13]Petitioners testified that the unanticipated sale of their previous residence required them to stay at the Memorial Drive property following the sale and that they actively tried to find a new home in the interim.  Ms. Yates also conceded at trial that petitioners used the Memorial Drive property as their principal residence for 14 of the first 24 months they owned the property.

**[\*22]** two months of the transaction, we found that the taxpayers failed to satisfy their burden of demonstrating their investment intent at the time of the exchange. Id., 2010 Tax Ct. Memo LEXIS 64, at \*13-\*14.

Conversely, in Reesink v. Commissioner, T.C. Memo. 2012-118, 2012 Tax Ct. Memo LEXIS 117, we upheld the validity of a section 1031 exchange by noting that the taxpayers' efforts to rent the home, including placing flyers in nearby areas and showing the property to potential renters, demonstrated their intent to hold the property for business purposes. Id., 2012 Tax Ct. Memo LEXIS 117, at \*16. We so held notwithstanding the fact that the taxpayers moved into the home eight months after the exchange. Id.

Similar to the taxpayers' failures in Goolsby, petitioners' failure to submit any evidence into the record regarding their efforts to transform the Memorial Drive property into a business enterprise underscores their lack of business motive in the exchange. Indeed, it is unclear whether it was even possible to convert the Memorial Drive property into a "bed and breakfast". Further, petitioners' use of the Memorial Drive property as their personal residence, beginning a mere four days following the close of the sale, creates a clear presumption of nonbusiness intent, exceeding that of the taxpayers in either Goolsby or Reesink.

**[*23]** Accordingly, we hold that petitioners must treat the Memorial Drive property as boot for purposes of determining their gain recognized on the exchange.

IV. <u>Allocation of Fair Market Values</u>

Neither the Commissioner nor this Court is bound to accept a contractual allocation lacking substance. <u>See, e.g.</u>, <u>Schulz v. Commissioner</u>, 294 F.2d 52, 56 (9th Cir. 1961), <u>aff'g</u> 34 T.C. 235 (1960); <u>Landry v. Commissioner</u>, 86 T.C. 1284, 1307 (1986). Rather, the economic realities of a transaction determine its tax consequences irrespective of the form chosen by the parties. <u>Hamlin's Trust v. Commissioner</u>, 209 F.2d 761, 764 (10th Cir. 1954), <u>aff'g</u> 19 T.C. 718 (1953); <u>see also</u> <u>Landry v. Commissioner</u>, 86 T.C. at 1307. This Court will generally uphold a contractual allocation if it has "'some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement.'" <u>Landry v. Commissioner</u>, 86 T.C. at 1307 (quoting <u>Schulz v. Commissioner</u>, 294 F.2d at 55). Conversely, "[a]n allocation by the buyer and the seller will be ignored if it is unrealistic or is not a result of arm's-length negotiations between parties with adverse tax motivations." <u>Id.</u> at 1307-1308 (citations omitted).

**[\*24]**   As noted supra, we find that Mr. Maynard and petitioners were adverse parties in the transaction at issue.  Consequently, the allocations provided in the purchase agreement are essentially afforded a presumption of business reality.  See Schulz v. Commissioner, 294 F.2d at 55 ("[C]ountervailing tax considerations upon each taxpayer should tend to limit schemes or forms which have no basis in economic fact.  The Commissioner should be slow in going beyond the values which the taxpayers state when such countervailing factors are present."); Int'l Multifoods Corp. v. Commissioner, 108 T.C. 25, 46 (1997); Landry v. Commissioner, 86 T.C. at 1307; Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 447 (1980).  We must therefore be circumspect to avoid altering their expectations without clear evidence indicating otherwise.

Respondent nonetheless disputes the characterization of the parties as adverse and offers that Mr. Maynard's ambivalence to the allocations in the governing agreement allowed petitioners an opportunity to contrive unrealistic and artificial values for the exchanged properties.  In support of this proposition, respondent relies on Mr. Maynard's testimony in which he stated that he believed the values of the Harper Avenue property and the Lakeview property were $1,800,000 and $350,000, respectively, at the time of the exchange.  Respondent

[*25] further submits that the exhibit attached to the purchase agreement establishing the allocations was manufactured solely by petitioners.

Yet Mr. Maynard's testimony was far more opaque regarding aspects of the exchange than respondent suggests. The following colloquy demonstrates that time has diluted Mr. Maynard's memory regarding specifics of the transaction and that it was likely that the parties collaborated on ascribing values to the exchanged properties:

> MR. YATES: Q- So is it your testimony here today that you do not know who supplied Exhibit B or where it came from?
>
> MR. MAYNARD: A- That's basically correct. To my best remembering, I honestly don't remember who structured it. I doubt - - I mean, I didn't even know the name of your business was Quality Farm, so I would have needed some assistance in structuring that if - - I wanted to buy that property. Let me make it perfectly clear. Mr. Yates and I went back and forth with each other for six months or a year as adjoining property owners, and we could never work anything out. And finally we came to that $2.15 million price, and - - but as far as structuring the values in there, I wouldn't have known how to do that, so I probably had some assistance from you. If I supplied that, then I was given some guidance by you, and I honestly can sit here with my hand on the Bible and say I don't recall any of that. * * *

It is also uncontested that Mr. Maynard initialed the exhibit containing the allocations and that his (HUD statement) listed the contract sale price as $2,150,000, with $505,000 due to Quality Pharm Group. Therefore, Mr. Maynard

[*26] at least at one point respected the allocated values established in the purchase agreement. It also strains credulity to suggest that Mr. Maynard, a businessman well versed in real estate sales, would not meticulously examine the purchase price agreement to ensure that his interests were adequately represented. In sum, we glean nothing from Mr. Maynard's testimony persuading us to reallocate the agreed-upon values of the properties in the purchase agreement.

Respondent next proffers that (1) petitioners' listing prices for the exchanged properties, (2) the value assigned by the appraiser in his 2005 appraisal of the Harper Avenue property, and (3) the sale price of Mr. Maynard's subsequent transfer of the Lakeview property more appropriately evidence the fair market values of the exchanged properties than the allocations in the purchase agreement. While respondent's position has superficial merit, we find that in these circumstances it would be unjustified to disturb the agreed-upon allocations.

A. Harper Avenue Property

Petitioners purchased the Harper Avenue property in 2003 for $403,000. From February 8 to August 4, 2005, petitioners engaged a local realtor to sell the property at its listing price of $2,499,000. The property was appraised in March 2005 at $1,800,000. Thereafter, in February 2006 petitioners engaged a separate realtor to sell the property at an increased listing price of $3.1 million. Mr. Yates

[*27] testified that he received only two separate bids on the property, both for $1.5 million. Both bids were rejected on the basis of what petitioners perceived as inherent, unacceptable risks.[14]

We believe that the aforementioned listing prices simply reflect petitioners' unbounded and unfounded hope to receive a windfall profit on their investment. Indeed, if petitioners had sold the Harper Avenue property at the listing prices, they would have secured a return on investment approximating 500% or 669%, respectively, in merely three years.[15] While we are cognizant that real estate values rise and fall, at times with great fluctuation according to the vicissitudes of the relevant market, there is no evidence before us which would support the excessive appreciation of the Harper Avenue property as implied in petitioners' listing prices. Correspondingly, we are not persuaded that the listing prices represent probative or suggestive evidence of the fair market value of the Harper Avenue property.

---

[14]As noted supra, Mr. Yates testified that the first bid called for a deferral of payment and the second bid was submitted by a purchaser with suspect credit.

[15]While petitioners apparently renovated the building at some point, respondent submits that petitioners' adjusted basis after holding the property for three years was $378,019. Clearly, then, the renovations were not so significant as to validate petitioners' excessive listing prices.

**[\*28]** Turning to the appraisal of the Harper Avenue property, we find that it also does little to aid in our inquiry. Respondent uses the appraisal of the Harper Avenue property as, essentially, an expert report in this case and in so doing exposes the limitations of relying on specialized manufactured evidence without affording the Court an opportunity to observe its creator and to question him as to the accuracy of his conclusions.[16] Indeed, when the appraisal of the Harper Avenue property is juxtaposed with a contemporaneous appraisal of a nearby property, we are left with diametrically different valuations without any means to reconcile the two.

The nearby property subject to the third-party appraisal, 201 Harper Avenue, was purchased for $488,000, a year before petitioners purchased the Harper Avenue property for $403,000. The two properties were similarly zoned and similarly sized, and the structures on the respective properties were of similar square footage.[17] Consequently, without further facts to differentiate the two

---

[16]In general, we will not admit an appraisal report as evidence of fair market value unless the author of the report testifies at trial and is available for cross-examination. Van Der Aa Invs., Inc. v. Commissioner, 125 T.C. 1, 7 (2005); see also Evans v. Commissioner, T.C. Memo. 2010-207, 2010 Tax Ct. Memo LEXIS 242, at \*17-\*18; Droz v. Commissioner, T.C. Memo. 1996-81, 1996 Tax Ct. Memo LEXIS 80, at \*13-\*14.

[17]The building on the Harper Avenue property was somewhat larger than the
(continued...)

[*29] properties, one might reasonably infer that they would appreciate or depreciate at congruent rates. An appraisal performed on 201 Harper Avenue estimated the market value of the property as of December 3, 2003, at $656,000. In contrast, petitioners' Harper Avenue property was appraised 15 months later, at $1.8 million. Respondent offers no explanation clarifying the discrepancies in the separate appraisers' estimates. Indeed, if we were to accept as accurate the 2005 Harper Avenue property appraisal, then we would have to concomitantly accredit the correlative proposition that both the Harper Avenue property and the 201 Harper Avenue property approximately tripled in fair market value in little over a year; we cannot logically accept this conclusion. Accordingly, without further evidence demonstrating that the two appraisals are compatible, we conclude that respondent has failed to establish the accuracy or reliability of the 2005 Harper Avenue appraisal.

We can also disregard as irrelevant the two $1.5 million bids that petitioners purportedly received on the Harper Avenue property. The record pertaining to these bids consists entirely of petitioners' brief trial testimony on the matter. As

[17](...continued)
presumably renovated building on the 201 Harper Avenue property. Nonetheless, the 201 Harper Avenue property was a larger real estate parcel than the Harper Avenue property.

[*30] noted supra, petitioners indicated that one bid called for deferred payment and the other was offered by a purchaser with questionable credit.  In these circumstances, it is plausible that such bidders might overbid on a property to remain competitive.  Consequently and on the basis of the unremarkable record at hand, we find that the purported bids are inconsequential to our inquiry.

B.  Lakeview Property

Discerning the fair market value of the Lakeview property at the time of the exchange is more difficult.  Petitioners purchased the property in 1992 for $27,000 and thereafter constructed a residence on the property.  Petitioners continuously improved the property through their period of ownership.[18]  The property was also fortuitously next to a golf course and near a beach.  In January 2006 petitioners engaged a local realtor to sell the property at a listing price of $419,000.[19]

---

[18]The parties disagree as to petitioners' adjusted basis in the Lakeview property.  Petitioners' assert that their adjusted basis is approximately $375,000, while respondent's statutory notice of deficiency indicates that petitioners' adjusted basis is $201,571.  This issue was not presented for decision; however, in either circumstance, petitioners' adjusted basis evidences they made significant efforts to improve the property.

[19]This listing price of the Lakeview property does not approach the unreasonableness of the listing prices for the Harper Avenue property.  Indeed, the listing price of the Lakeview property exceeds the amount that respondent submits represents fair market value of the property at the time of the exchange by only $69,000.

**[*31]** Apparently, no bids were submitted at that price. Petitioners' contract with the realtor terminated on July 13, 2006. At trial Mr. Maynard testified that he believed the property to be worth $350,000 at the point of exchange. Furthermore, following his March 2006 purchase of the Lakeview Drive property, Mr. Maynard spent approximately $10,000 to $15,000 repairing the property. Nine months later, in November 2006 Mr. Maynard sold the Lakeview Drive property for $310,000.

These facts, standing alone, suggest that the allocation of $750,000 to the Harper Avenue property in the purchase agreement was excessive. Nonetheless, petitioners repeatedly assert that the allocation represents a bargained-for-agreement and that many of the facts respondent cites in his argument do not reflect nor adequately account for the tumultuous period in the real estate market during which the salient events of this case took place; we agree with petitioners.

In determining the fair market value of a property, we endeavor to ascertain the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under a compulsion to buy or to sell. See United States v. Cartwright, 411 U.S. 546, 551 (1973) (applying the standard set forth in section 20.2031-1(b), Estate Tax Regs.). The standard is objective, using a hypothetical willing buyer and seller who are

**[\*32]** presumed to be dedicated to achieving maximum economic advantage in any transaction involving the property. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). The objective willing buyer-willing seller standard must be achieved in the context of market and economic conditions on the valuation date. Id.

As noted supra, we believe the agreed-upon allocations by the adverse parties in this case serve as the most compelling evidence of the properties' fair market values entered into the record. Mr. Maynard, as a knowledgeable businessman, undoubtedly pursued his best interests in the transaction. Although at one point at trial Mr. Maynard testified that he would not have allocated the purchase price in the manner represented in the purchase agreement, he also testified that he was ultimately responsible for and provided petitioners with the purchase agreement and admitted that it was possible that he received "guidance" from them on the allocations. We do not believe, as respondent submits, that Mr. Maynard would cavalierly dismiss the allocations without assessing their effect upon him. Indeed, Mr. Maynard initialed the page of the purchase agreement upon which the allocations are displayed prominently. When viewed in its entirety, Mr. Maynard's testimony reflects that he does not recall, with any degree of specificity, critical aspects of the transaction at issue. The purchase agreement,

[*33] therefore, best represents the willing sellers' and willing buyer's contemporaneous views of the fair market values of the properties exchanged.

Concerning the general economic conditions at the point of exchange, even a casual observer of the real estate market during that period would undoubtedly recognize its tumult.[20] Petitioners aver that the exchange of the Lakeview property with Mr. Maynard occurred at the zenith of the real estate market in Wilmington, North Carolina, and, conversely, Mr. Maynard's sale of the property nine months later occurred at its nadir. Respondent has not addressed this point but has tacitly recognized its validity by submitting the fair market value of the property as $350,000 rather than $310,000, which Mr. Maynard received on his subsequent sale of the property.

In our effort to analyze the fair market value of the exchanged properties through the prism of the relevant market at the point of transfer, we believe that the allocations in the purchase agreement serve as the most reliable evidence in the record before us.

---

[20]We draw no negative inference from the fact that no bids were submitted for the Lakeview property during the two months it remained on the market at a listing price of $419,000. The lack of bids in such a short period is not reflective of a universal lack of interest.

**[\*34]** C.  Conclusion

Real estate valuation is a question of fact to be resolved on the basis of the entire record.  See Ahmanson Found. v. United States, 674 F.2d 761, 769 (9th Cir. 1981); Estate of Fawcett v. Commissioner, 64 T.C. 889, 898 (1975).  In accord with our prior discussion, we find that respondent has failed to satisfy his burden of proof in this matter.

V.  Penalties

The Commissioner bears the burden of production on the applicability of an accuracy-related penalty and must come forward with sufficient evidence indicating that it is proper to impose the penalty.  See sec. 7491(c); see also Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once the Commissioner has satisfied his burden of production, the taxpayer has the burden of persuading the Court that the Commissioner's determination is incorrect.  See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 447.  A taxpayer can meet this burden by proving that he or she acted with reasonable cause and in good faith.  Sec. 6664(c)(1); see also Viralam v. Commissioner, 136 T.C. 151, 173 (2011).

Respondent, in the statutory notice of deficiency, determined that petitioners are liable for an accuracy-related penalty because of a substantial understatement of income tax or, alternatively, for negligence or disregard of rules or regulations.

**[\*35]** <u>See</u> sec. 6662(a) and (b)(1) and (2).  In posttrial briefs, however, respondent focused solely on petitioners' alleged substantial understatement of income tax.  Accordingly, we conclude that respondent has abandoned his alternative argument relating to petitioners' alleged negligence or disregard of rules or regulations.  <u>See</u> <u>Mendes v. Commissioner</u>, 121 T.C. 308, 312-313 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned.").

A substantial understatement of income tax exists if the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  Petitioners conceded various adjustments to income before trial, and our findings <u>supra</u> may require some adjustments to petitioners' 2006 tax liability.  As the effect of such computational adjustments remains unclear, we cannot presently determine whether petitioners' underpayment was due to a "substantial understatement" of income tax for their 2006 taxable year.  This issue, however, will be resolved following a Rule 155 computation.

Notwithstanding that for the moment we leave unresolved whether petitioners reported a substantial understatement of income tax for their taxable year 2006, for purposes of judicial economy we turn to whether petitioners had reasonable cause and acted in good faith as to any underpayment of their income tax liability.

[*36]  "Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item."  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).  A taxpayer may demonstrate reasonable cause through good-faith reliance on the advice of an independent professional, such as a tax adviser, a lawyer, or an accountant, as to the item's tax treatment.  United States v. Boyle, 469 U.S. 241, 251 (1985); Canal Corp. & Subs. v. Commissioner, 135 T.C. 199, 218 (2010); sec. 1.6664-4(b), Income Tax Regs.  To prevail in this effort, the taxpayer must show that he or she:  (1) selected a competent adviser with sufficient expertise to justify reliance; (2) supplied the adviser with necessary and accurate information; and (3) actually relied in good faith on the adviser's judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99; see Sanford v. Commissioner, T.C. Memo. 2008-158, 2008 Tax Ct. Memo LEXIS 159, at *17.

Petitioners submit that they relied on their accountant in preparing their taxable year 2006 return; however, at trial they offered no testimony or evidence concerning the expertise of their accountant, the information they allegedly provided to their accountant, or their actual reliance in good faith on their accountant's advice.  Accordingly, we find that petitioners have failed to demonstrate their reasonable cause and good faith in this case.

**[\*37]** VI.  <u>Conclusion</u>

Recapitulating our prior discussions, we hold that (1) petitioners failed to demonstrate that they held the Memorial Avenue property for investment or business purposes; (2) respondent failed to satisfy his burden of proof in his attempt to demonstrate that petitioners improperly allocated fair market values to real properties in their like-kind exchange; and (3) subject to a Rule 155 computation, petitioners are liable for a section 6662(a) accuracy-related penalty.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, groundless, or otherwise without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.